# HOLTZMAN *v.* LINTON.

EQUITY; COMPROMISE AGREEMENT; FRAUD; TRUST AND TRUSTEES; ACCOUNTING; AUDITOR.

1. The weight ordinarily given and favor shown to a compromise agreement in settlement of disputes depend not only upon the apparent reasonableness of the claims asserted and good faith of the party

making them and taking benefit thereby, but also upon the condition of the parties and their prior relations with each other.

2. If a compromise agreement is based upon invalid contracts and conveyances, it falls with them, unless made under circumstances showing new considerations and fair dealings.

3. Where fiduciary relations exist between grantor and grantee, the fiduciary is under a plain moral duty not to put himself in any situation which would tend to excite a conflict between his self-interest and his duty to his client, principal, or obligee, of whatsoever nature.

4. Whenever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him. (Following *Moran v. Daly*, 12 App. D. C. 137.)

5. The mere existence of fiduciary relations, as in the case of parent and child, and some others of a similar nature, does not shift the burden of proof to the superior party to show the validity of the transaction. (following *Murray* v. *Hilton*, 8 App. D. C. 281) ; but gifts procured by agents, and purchases made by them from their principals, should be scrutinized with a close and vigilant suspicion.

6. In a suit against a real-estate broker and lawyer by a former customer or client, to vacate certain deeds procured by him to be executed by her in his interest and for the cancelation of an alleged compromise agreement confirming such deeds, it was *held*, on a review of the evidence, showing, among other things, that the defendant had purchased one interest from the complainant for $1,175, worth $2,500, and that shortly prior thereto he had collected over $800 for her, for which he failed to account,—that whether, in view of the fiduciary relation of the defendant to the complainant, the burden was on him to show the validity of the transactions, the testimony as a whole was sufficient to justify a decree vacating the deeds and canceling the agreement.

7. Where a decree for an accounting directed the auditor to charge the defendant, a trustee, with all funds which, by due diligence, he would have received on account of the complainant, it was *held* to be correct in so far as it might embrace rents of the property involved, lost by his negligence during his agency for the complainant; but, if intended to include the matter of the collection of certain claims assigned to him for the purpose, the evidence relating thereto was not sufficient to warrant the charge against him; and, as the auditor was authorized by the decree to hear additional evidence necessary to the statement of a true account between the parties, it was directed that any item of

charge on either account that he might allow should be separately stated so that it might be made the ground of an exception to his report.

No. 1617.   Submitted February 20, 1906.   Decided April 3, 1906.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia in a suit in equity for the cancelation of certain deeds, etc.   *Affirmed.*

The COURT in the opinion stated the facts as follows:

This suit was begun on April 22, 1903, by Mary Almarolia, to obtain the cancelàtion of certain deeds, and conveyances in trust, under which William F. Holtzman, Aylett T. Holtzman, and Ella L. Castleman claimed certain interests in, and liens upon, lot 1, in square 941, in the city of Washington; and a compromise agreement of December 10, 1902, purporting to recognize and confirm the interests aforesaid, and to give a lien upon the remaining interest of complainant, to secure certain recited indebtedness.   The bill sought, also, to restrain trustee's sales under certain instruments securing indebtedness on said lot.

Henry F. Woodard, William H. Sholes, Arthur A. Birney, and Willoughby S. Chesley were made formal defendants as trustees named in the several trust instruments sought to be affected.   Elihu Root, as Secretary of War, at the time, was made a defendant in order to secure a correction of an official certificate issued by him relating to the release of the title to said lot by the United States, in accordance with an act of Congress providing therefor.

It is unnecessary to recite the averments of the bill, or the answers of the defendants, as they are indicated by the statement of the evidence.   It is sufficient to say that the complainant alleged long-continued fiduciary relations between her and defendant, William F. Holtzman, the intrusting of the management of her affairs to him, and fraudulent representations made to, and impositions practised upon, her, through which her

signature was obtained to the several instruments sought to be canceled. She also prayed for the rendering of an account.

William F. Holtzman answered under oath, denying each and every allegation of fraud and imposition, and claiming that the conveyances were made in good faith for money actually paid, etc. Aylett T. Holtzman and Ella L. Castleman denied all fraud as charged, and alleged that whatever legal title appeared to be in them was for the sole benefit of William F. Holtzman. The defendants, sued as trustees, made formal answers disclaiming any beneficial interests, and submitting themselves to the discretion of the court in the premises. Elihu Root made a formal answer substantially to the same effect.

Mary Almarolia died before the hearing below, and, on suggestion thereof with proof that she had made a will devising and bequeathing her estate in trust to Irwin B. Linton, who was also appointed her executor, the latter was, on September 9, 1904, substituted as party complainant in her stead.

2. The hearing was had in the equity court upon the testimony taken on both sides, and on June 21, 1905, that court entered a decree to the following effect substantially:

(1) That the conveyance of November 13, 1896, to Aylett T. Holtzman, be and is hereby vacated and for naught held.

(2) That the conveyance of April, 1896, to William F. Holtzman, be and is hereby declared a security merely for whatever expenditures may have been made by him for complainant on account of the said lot.

(3) That the trust deed of November 20, 1902, in favor of Ella L. Castleman for $970, is reformed and corrected, as also the promissory note therein recited so as to name William F. Holtzman as the beneficiary thereof instead of Ella L. Castleman, reduce the principal to $150 instead of $970, and that the matter of interest be treated as hereafter stated.

(4) That William F. Holtzman and Ella L. Castleman are hereby enjoined from causing or permitting the said promissory note of November 20, 1902, or the $450 or $500 promissory notes referred to in the bill, to be transferred to any third party.

(5) That the instrument dated November 20, 1902, purport-

ing to be a compromise agreement, be and is hereby vacated and for naught held.

(6) That all of the defendants, excepting Elihu Root, be restrained, until further order of the court, from taking any steps looking to a sale of the said premises under any of the instruments referred to in the bill.

(7) That the defendants, William F. and Aylett T. Holtzman, be declared to hold in trust for complainant all of the right, title, and interest shown to be in them by virtue of the entry made April 15, 1902, in the records of the War Department, and that within five days they shall prepare and execute to Irwin B. Linton, trustee, a deed conveying the same, in default of which conveyance this decree shall have the same operation and effect as if the said conveyance had been executed conformably to this decree.

(8) That the instrument of May 1, 1891, recorded in liber 2118, folio 347 *et seq.,* of the land records of the District of Columbia, be, and is hereby, vacated.

(9) That defendant William F. Holtzman be perpetually restrained from doing anything under the instrument of date January 15, 1887, recorded in liber 1229, folio 168 *et seq.,* of same land records.

(10) That the defendants, William F. and Aylett T. Holtzman, be and are severally and perpetually restrained and enjoined from making any further claim of ownership in said lot inconsistent with this decree.

(11) That this cause be, and it is hereby, referred to the auditor of this court for a full and complete accounting covering all of the affairs of the fiduciary relationship between Mary Almarolia and defendant William F. Holtzman, taking in the course of such accounting such additional evidence as may be necessary, and charging defendant William F. Holtzman not only with all funds which it is or shall be established by positive and direct evidence that he did receive, but also with all funds which the auditor shall be satisfied from his conduct and the circumstances that he did receive, and all funds which, by the exercise of due diligence, he would have received; and the

auditor is directed to allow defendant William F. Holtzman in such accounting no compensation for his administration, but to charge him with the expense, including necessary and reasonable attorneys' fees, of removing the effects of his administration, and also to charge him with compound interest, with rests for its calculation annually, upon every sum of money found by the auditor to have been received by him for, and withheld from, Mary Almarolia, such compound interest to be charged from the date when it is found that he ought reasonably to have paid the same over to her; and the auditor is further directed in such accounting to take into account, and credit defendant William F. Holtzman, at the proper dates, with the sums of money due from Mary Almarolia under the $450 and $500 deeds of trust referred to in the bill of complaint, as also under the reformed and corrected $150 deed of trust hereinbefore referred to, and under the chattel trust referred to in the bill of complaint, treating defendant William F. Holtzman as the real party in interest under said several trusts in the place and stead of defendant Ella L. Castleman, and allowing no interest upon any of the sums of money from the time when the respective instruments came under the control of defendant William F. Holtzman.

(12) That George E. Sullivan be and is hereby appointed receiver, upon giving bond, to be approved by the court, in the sum of $500, to collect the rents and manage the affairs of the lot and premises herein involved until the further order of the court.

(13) That the complainant recover of defendant William F. Holtzman all costs herein to date, and have execution therefor as at law.

(14) That jurisdiction of this cause be and is hereby retained for the entry of the further proper orders upon the coming in of the report of the auditor.

William F., Aylett T. Holtzman, and Ella L. Castleman have appealed from this decree.

*Mr. S. T. Thomas, Mr. E. Hilton Jackson,* and *Mr. A. S. Worthington* for the appellants.

*Mr. George E. Sullivan, Mr. J. Altheus Johnson,* and *Mr. Irwin B. Linton* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

3. In our view of the issues involved on this appeal no useful purpose would be served by reviewing and discussing at length the confused and conflicting mass of testimony in this case, which occupies more than six hundred pages of the printed record. Much is utterly irrelevant; much the result of unnecessary repetition; and much relates particularly to matters referred to the auditor, who is charged with reporting a true statement of the accounts between the parties, and before whom additional testimony bearing thereon may be taken. We shall content ourselves, therefore, with stating the particular facts which we regard as established by the evidence, and which will require considerable space.

(1) The complainant, Mary Almarolia, was a negro whose chief occupation between the year 1883 and the time of her death was conducting an eating and boarding house in the city of Washington. She was the sole heir at law of her father, Michael Shiner, and was a childless widow. She had learned to read and write, and was regarded as an intelligent woman of her class. Some time between 1896 and 1900 she fell in alighting from a street car, and sustained injuries, as a result of which she could do no more than sign her name in an awkward manner. Before 1900 her eyesight began to fail from what an oculist called incipient cataract of each eye. The oculist of the Lutheran Eye Infirmary examined her on April 6, 1900, and recorded her as four-sixtieths in each eye,—the equivalent of one-fifteenth vision. She was almost blind, but might see well enough to sign her name. Her eyesight became no better and probably grew worse. Aside from the accident before referred

to, she had good health and strength, and was actively engaged
in conducting her business until, in December, 1902, she had
her foot pierced by a nail, and just before December 16, 1902,
the date of the execution of the compromise agreement, she was
confined to her bed and threatened with blood poisoning.   On
that morning William F. Holtzman came with a notary to pro-
cure her signature, and had to leave the room while the attend-
ing surgeon opened and drained pus sacs in her foot.   She
took no anæsthetic, and was suffering great pain.   She had
a septic fever, and, in the opinion of the surgeon, was in no con-
dition to transact business.

(2) Michael Shiner, the father of complainant, claimed the
lot in controversy under a deed from one Todd, in 1867, and
recorded in 1868.   He took possession, filled the same at con-
siderable expense, erected a house thereon in which he lived and
died.   His possession and that of his daughter, who succeeded
him therein, was open, exclusive, uninterrupted, and adverse to
all the world, for more than twenty years.   The title had never
passed out of the United States, and complainant attempted to
obtain an act of Congress recognizing the same.   An act author-
izing the Secretary of War to extend the title, among others,
was finally enacted March 3, 1899 (30 Stat. at L. 1346, chap.
433).   This lot was entered upon the tax rolls as early as 1890
as having an area of 8792 square feet, valued at $4,396.

(3) William F. Holtzman was an agent for the sale of real
estate and the lending of money thereon, and claimed to be a
lawyer.   Aylett T. Holtzman, his brother, was an assistant and
probably interested.   Ella L. Castleman was his sister-in-law.
Whatever legal title to the lot was lodged in them was held for
him, and they admit him to be the real owner of the same.

(4) Michael Shiner's estate was administered upon by one
Little in 1883, and consisted chiefly of a claim against the
United States depending in the court of claims.   Complainant
intrusted the management of her property interests to William
F. Holtzman, and placed implicit confidence in his capacity and
integrity.   On May 1, 1884, she gave a written order to Little
to pay to said Holtzman all money payable to her as distributee

of said estate, and he received thereon $124.64 on July 5, 1884.

(5) On January 15, 1887, Holtzman obtained from complainant a deed of trust upon the lot to secure two notes therein recited of $180 and $385, respectively. (How much money was in fact advanced by him, and how much she may have repaid, are among the questions referred to the auditor. It may be added, however, that she seems to have fully paid off the $180 note made to one Koomes to secure the rent of a house occupied by her.)

Holtzman advertised the lot for sale, and complainant procured one John G. Slater to save her property. Slater paid the cost of advertising the sale, and had Holtzman assign his interest to him. Slater had the complainant make to him a conveyance of the lot, reciting a consideration of $5,000, but the same was not recorded. Slater seems to have made some futile attempts to have Congress recognize complainant's title. Slater became involved in the winter of 1895, and entered into negotiations with Holtzman for the retransfer of the claim. The notes, however, had remained in the possession of Holtzman during the time. On February 11, 1896, Slater procured the signature of complainant to a receipt purporting to have received from him "$800 at various times, and also the rents collected by said Slater, which said $800 is due said Slater partly in open account and notes bought from William F. Holtzman through her solicitation, and are all right; and this sum is found to be due said Slater at the present time on lot 1, square 946." On March 6, 1896, "for value received," he transferred all his interest in the above to William F. Holtzman. He also gave him the unrecorded deed. Holtzman claims to have paid Slater $800 for said claim, but the testimony is anything but clear as to that. Whatever money he paid Slater, however, was out of a fund belonging to complainant at the time, for it appears clearly that on or before that date Holtzman received the net sum of $883 from Little, being the final balance due to complainant on settlement of his account as administrator. Holtzman concealed the fact of this collection from complainant,

who learned it from the attorney who represented her interests, though employed by Holtzman for that purpose.

(6) During the entire time of his agency for complainant, W. F. Holtzman kept no books and made no entries showing his various transactions with her and moneys received or advanced, nor did he ever render her an account. That he advanced some money to her from time to time there is no doubt. Complainant admits the receipt of sums at various times, and offers to account therefor. For all items of advances claimed Holtzman was compelled to rely upon his memory, which was shown to be defective. (These matters are included in those referred to the auditor.) Aylett T. Holtzman produced a partial account relating to rents collected by him, and payments made, after W. F. Holtzman claimed to own a half interest in the lot. This appears inaccurate, in that complainant is charged with the entire expense of repairs, some of which, moreover, are shown to have been paid for by her in person.

(7) On April 11, 1896, the lot was sold at tax sale and purchased by William F. Holtzman in the name of Ella L. Castleman, to whom the deed was subsequently made by the commissioners of the District. The taxes amounted to $165.55. Complainant had no knowledge of this transaction at the time. So far as the record discloses, this sale was void.. As the title to the lot was in the United States, it is not apparent that it could have been assessed for taxes at all, and, moreover, the assessment seems not to have been made against complainant, but one L. C. Williamson, who does not appear otherwise as having or claiming any interest in the property.

(8) On April 18, 1896, William F. Holtzman obtained from complainant a deed, upon a recited consideration of $10, conveying to him a one-half undivided interest in the lot, which was recorded June 2, 1896. Whatever the means used to procure this deed, it is evident that it was not understood by complainant as intended to convey the same absolutely. As held by the court below, it can be regarded as nothing more than a security for any money then actually due by the complainant, the ascertainment of which has been referred to the auditor.

(9) On November 13, 1896, Aylett T. Holtzman procured from complainant a deed, upon a recited consideration of $10, conveying to him an undivided one-fourth interest in said lot. No consideration is shown to have been paid for this conveyance, and the grantee admits that he took it for William F. Holtzman as the real owner. During this time the Holtzman brothers were trying to secure the passage of an act of Congress securing the title to the lot to the complainant.

(10) On November 3, 1899, Congress passed an act authorizing and directing the Secretary of War to correct the records of his department in respect of a number of lots mentioned, including the one in question, "upon the filing, by an actual occupant of any of the lots mentioned,   *   *   *   sufficient proof that the said occupant, or the party under whom he claims, has been in actual possession of the said lot or lots for an uninterrupted period of twenty years, so that said records shall show the title to said lots to be in the said occupant." 30 Stat. at L. 1346, chap. 433.

Prior to the enactment, namely, March 10, 1898, complainant subscribed and swore to a petition addressed to Congress to secure her title, in which it was represented that she had previously conveyed an interest in said lots to William F. and Aylett T. Holtzman. This was signed by complainant (at request of said Holtzmans, as she had signed all previous papers presented to her by them), who does not appear to have understood that she was thereby ratifying or confirming any actual interest of theirs in said lot. On December 1, 1901, an attorney employed by Holtzman wrote a letter to the Secretary of War, as attorney for Mary Almarolia, inclosing papers referring to the title, and asking that the records of the department might be corrected so as to show title to said lot in Mary Almarolia, William F. Holtzman, and Aylett T. Holtzman, "as their interests may appear," under said act of Congress. With this was filed an affidavit signed by complainant and setting up the possession of Michael Shiner and herself, and stating that she had conveyed a one-half interest to William F. Holtzman and a one-fourth interest to Aylett T. Holtzman. The War De-

partment required a quitclaim of other outstanding interests, and, in compliance therewith, Holtzman presented a quit-claim deed from Ella L. Castleman, dated January 8, 1902, releasing her interest under the tax deed before mentioned to Mary Alma-rolia, William F., and Aylett T. Holtzman. On April 15, 1902, the War Department corrected the records so as to show the title to be in complainant and the two Holtzmans, and issued the necessary certificate to that effect, which went into the possession of William F. Holtzman.

(11) On April 2, 1902, complainant executed a mortgage with power of sale conveying certain chattels to said Holtzmans to secure $200 alleged to have been loaned by Ella L. Castleman. As this does not affect the title, it is unimportant to consider the evidence relating to it, as all questions concerning it are included in the reference to the auditor.

(12) On October 2, 1902, complainant borrowed $500 of A. A. Birney, and conveyed the entire interest in the lot to Woodard, trustee, to secure the same. On October 21, 1902, she borrowed $450 from S. C. Mills, and made another conveyance to Wm. H. Sholes, trustee, to secure the same. These instruments were made in good faith, and complainant admits the indebtedness thereunder. Both notes were subsequently purchased by William F. Holtzman for himself, but in the name of Ella L. Castleman, who had no actual knowledge of the transaction. In the name of Ella L. Castleman, Holtzman directed Sholes, trustee, to sell under said second deed of trust. Sale was made on March 28, 1903, of 22-60 of said lot, and the same was bid in by one Works, by direction of Holtzman, in the name of Ella L. Castleman. The sale was not perfected, and the same is enjoined by the decree passed below, pending the report of the auditor and further order thereon. (This indebtedness is included in the accounts ordered to be taken by the auditor.)

(13) Until the fall of 1902, the confidence of complainant in Holtzman had remained unimpaired. Her suspicions seem first to have been aroused by information from another person of the collection made by him of the $883 due her from the administrator of her father's estate. She began inquiries and de-

manded an account of her agent's doings. She then retained an attorney, who conferred with Holtzman and evidently in good faith gave credence to his statements. The result was that a compromise agreement was prepared for her signature on November 20, 1902. This agreement recited the conveyance by complainant to William F. Holtzman of a one-half interest in said lot, and to Aylett T. Holtzman of a one-fourth interest by reference to the deeds. Further reciting a dispute between them, it was agreed that the remaining interest of complainant was 22-60 of the said lot, instead of one-fourth, and that William F. Holtzman has the just right to receive from Mary Almarolia the following sums: The proportionate part of taxes paid by Holtzman in the years 1896, 1897, 1898, 1899, 1900, 1901, and 1902, $250.36; advance of money by Holtzman to Mary Almarolia in excess of her proportionate part of net rentals of said premises and for interest thereon from November 1, 1901, $295.75; for money advanced by him to Mary Almarolia and now in part secured by a chattel deed of trust, $250. For the aggregate of said sums said Almarolia is to execute a proper deed of trust upon her equitable interest in said 22-60 of the said lot. All other claims of either party are canceled and surrendered.

This instrument was presented to complainant, who refused to execute the same. Thereupon her attorney withdrew from the matter.

(14) Thereafter complainant sustained an injury to her foot which confined her to her bed. On December 11, 1902, immediately after the performance of an operation upon her foot for the removal of the pus sacs, as hereinbefore related, and while she had fever and was suffering great pain, Holtzman called upon her with a notary and demanded her signature to said agreement. She was in no condition to transact business at the time, and asked a postponement, which he declined. In addition to the sum contained in the recitals of the agreement he offered her a loan of $150, of which she was in great need. She was propped up in bed, and her attending nurse and friend held her hand or arm and directed it in making her signature. In

the same way she executed the trust deed conveying the 22-60 of the lot to Birney and Chesley, trustees, to secure an indebtedness to Ella L. Castleman of $970, reciting that the same was for money loaned and advanced in part to pay taxes, and was evidenced by a note for said sum executed to said Castleman or order and payable in five months. This was made up of the sums mentioned in the agreement and the $150 then paid. Ella L. Castleman had nothing to do with the transaction, and William F. Holtzman was the real beneficiary. The money was left in the hands of the nurse for the complainant. Shortly after recovering sufficiently to attend to her affairs, complainant retained her present attorney, and this suit was the result.

(15) In addition to the fact that Wm. F. Holtzman acted as the agent of Mary Almarolia in the matter of renting and securing title to the lot, and as her attorney in the matter of the administration of her father's estate, she assigned to him certain other claims for collection. She took no receipts from him, and he took none from her, for money advanced. Her trust and confidence in him are further shown by the fact, testified to by him, that, on September 27, 1901, when she obtained a loan of $25: "I wrote her will, when she said the doctor said she was not going to live long, and she wanted to put the whole thing in my hands, so she could cut out some of her children who had been ungrateful to her." The contents of this will were not proved, and it was necessarily revoked by the will of March 11, 1904, of which Irwin B. Linton, the appellee, is the executor.

(16) According to the testimony of several real estate dealers, the lot in question has for two years past been worth from $6,500 to $7,500.

4. In the application of the established principles of equity to the facts before recited, we need not enter upon a discussion of the weight of evidence ordinarily necessary to warrant the rescission of deeds or agreements of compromise, made between parties under no special obligations to each other, on a bill charging the practice of fraud and imposition in the procurement of their execution. The weight ordinarily given and the favor shown to a compromise agreement in settlement of disputes con-

cerning mutual rights and obligations, depend not only upon the apparent reasonableness of the claims asserted, and good faith of the party making the same and taking a benefit thereby, but also upon the condition of the parties and their previous relations with each other.

If based on contracts and conveyances found to have been made under conditions rendering them invalid, a subsequent compromise agreement, unless made under circumstances showing new considerations and fair dealing, will fall with them.

Nor is it important to consider whether the circumstances indicating the considerations entering into the agreement, or the disparity between the parties, intensified by the particular condition of the complainant at the time that the execution was obtained, are sufficient to support the decree of cancelation under the doctrine governing the case of *Allore* v. *Jewell,* 94 U. S. 506, 24 L. ed. 260. The proof, as we have seen, shows that the parties had been in fiduciary relations for many years. The principal defendant, William F. Holtzman, was an experienced real-estate dealer and manager, and seems, at one time, to have been admitted to the District bar. Well acquainted with the complainant, he voluntarily assumed the management of her affairs and the conservation of her interests, not only in respect of the property involved in this suit, but of other matters also. The complainant, on the other hand, was a negro woman, unfamiliar with the transaction of business of the character intrusted to her agent and attorney, who had implicit confidence in his capacity and integrity. She adopted his suggestions, and executed all papers submitted to her by him without suspicion or question. Being needy and improvident, she asked for and obtained advances of money from him, and his apparent generosity tended to increase her confidence and trust. During the same time, he received money belonging to her, rendering no account, taking and giving no receipts, and keeping no books showing regular entries of money received and paid out, as he was in duty bound to do. The first transaction by which he acquired a semblance of interest in complainant's lot was the tax sale in April, 1896. So far as the record discloses, these taxes were

neither due by her nor a valid charge upon her title, and the purchase under sale therefor, if not expressly fraudulent, was, at least, ill-advised and negligent.

In considering the character and effect of the subsequent instruments, whereby defendant obtained absolute conveyances of three fourths of the lot, and a lien upon complainant's remaining interest, it must be remembered that when fiduciary relations exist between grantor and grantee the fiduciary is under a plain moral duty not to put himself in any situation which would tend to excite a conflict between his self-interest and his duty to his client, principal, or obligee, of whatsoever nature. *Michoud* v. *Girod,* 4 How. 502, 554, 11 L. ed. 1076, 1099; 2 Pom. Eq. Jur. sec. 956.

As has been well said by Lord Chancellor Chelmsford: "The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise. Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed." *Tate* v. *Williamson,* L. R. 2 Ch. 55.

In discussing the obligations arising out of fiduciary relations where there is no intentional concealment, no misrepresentation, no actual fraud, Mr. Pomeroy says: "The doctrine to be examined arises from the very conception and existence of a fiduciary relation. While equity does not deny the possibility of valid transactions between the two parties, yet, because every fiduciary relation implies a condition of superiority held by one

of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption. One principle underlies the whole subject in all its applications; and this principle may be stated in a negative and in an affirmative form. Its negative aspect cannot be better expressed than in the following language of a most able judge in a recent decision [Wood, V. C., in *Tate* v. *Williamson,* L. R. 1 Eq. 528, 536] : 'The broad principle on which the court acts in cases of this description is that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him.' " 2 Pom. Eq. Jur. sec. 956; *Moran* v. *Daly,* 12 App. D. C. 137, 146.

The Supreme Court of the United States has always maintained the doctrine that the mere existence of confidential relations, as in the case of parent and child and some others of a similar nature, does not shift the burden of proof to the superior party to show the validity of the transaction. *Towson* v. *Moore,* 173 U. S. 17, 19, 43 L. ed. 597, 598, 19 Sup. Ct. Rep. 332. See also *Murray* v. *Hilton,* 8 App. D. C. 281, 284. At the same time it has also been said that "gifts procured by agents, and purchases made by them from their principals, should be scrutinized with a close and vigilant suspicion." *Ralston* v. *Turpin,* 129 U. S. 663, 675, 32 L. ed. 747, 751, 9 Sup. Ct. Rep. 420, and cases before cited.

Whether the rule of presumption declared in such cases can be extended to the express fiduciary relations shown to have existed in this case is, under the facts heretofore recited, unimportant. Assuming that the burden was upon the complainant to rebut the presumption of the validity of her conveyances,

her evidence, unless overcome by that of the defendants, was ample to justify the decree for cancelation and the taking of an account. Instead of being overcome, or even weakened, by the evidence on behalf of the defendants, the case of complainant was strengthened by certain material facts elicited from the defendant and certain of his witnesses. Having kept no account of his advances to, and on account of, the complainant, he was unable to make a satisfactory explanation of the consideration for the first conveyance of the half interest in the lot. That interest, which he claimed to have purchased for $1,175, was worth, as he well knew, not less than $2,500 at the time, and it was proved beyond question that shortly prior to the date of the conveyance he had collected $883 for her from the administrator of her father's estate. When compelled to admit the receipt of this money he was unable to explain its disposition.

It is unnecessary to refer to other slighter circumstances tending to show the abuse of the trust reposed in him. This conveyance, it will be remembered, was not canceled outright, but declared to constitute a lien merely for any money that complainant may in fact have owed him at the time.

5. The decree has been further objected to because of the direction to the auditor, in taking the account, to charge the defendant with all funds which, by due diligence, he would have received on account of complainant, as well as with compound interest upon all sums proven to have been actually received, from the respective dates of receipt.

It does not plainly appear to what the first item of this directed charge extends. In so far as it may embrace rents of the property, if any, lost by negligence during the agency therefor, it is clearly right. If intended to include also the matter of the collection of certain claims assigned to him for the purpose, the evidence relating thereto is not sufficient to warrant the charge. The auditor is authorized, however, to hear additional evidence, if necessary to the statement of a true account between the parties. Any item of charge on either account that he may allow will be separately stated, and may hereafter be made the ground of an exception to the auditor's report. In all other re-

spects, the decree as rendered will be affirmed with costs, and it is so ordered, and the cause will be remanded for further proceedings not inconsistent with this opinion.        *Affirmed.*

An appeal to the Supreme Court of the United States was allowed April 11, 1906.