## RALSTON *v.* TURPIN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF GEORGIA.

No. 98. Argued November 26, 27, 1888. — Decided March 5, 1889.

An agent is bound to act with absolute good faith towards his principal, in respect to every matter entrusted to his care and management. In accepting a gift from his principal he is under an obligation to withhold no information in his possession respecting the subject of the gift, or the condition of the estate in his hands, which good faith requires to be disclosed, or that may reasonably influence the judgment of the principal in making the gift. All transactions between them whereby the agent derives advantages beyond legitimate compensation for his services will be

closely examined by Courts of Equity, and set aside if there be any ground to suppose that he has abused the confidence reposed in him.

When the proof is conflicting upon the point of undue influence exerted upon one making provision by deed in favor of the person alleged to have exerted the influence, and it appears that the contestant, having full knowledge of all the circumstances, made no averment in his original bill of the incapacity of the grantor, and did not raise that issue until an amended bill was filed a year later, that fact is entitled to weight in determining the case.

When incapacity caused by drunkenness is alleged as a cause for annulling a deed, the vital inquiry is as to the capacity of the grantor when the deeds were executed, and not as to his capacity when drunk.

Section 2666 of the Code of Georgia, relating to gifts made to a guardian by a minor just after arriving at majority does not apply to the case of a deed or will in favor of his guardian made by a person some years after arriving at his majority; but even if it did apply, such a deed would be good if made with a full knowledge of the facts, and without any misrepresentation or suppression of material facts by the guardian.

As the record in this case discloses nothing impeaching the final settlement made between the guardian and his ward, § 1847 of the Code of Georgia does not apply to it.

Section 3177 of the Code of Georgia, relating to gifts from one party to another where there are confidential relations arising from nature, or created by law, or resulting from contracts where one party is so situated as to exercise a controlling influence over the other, is only a statement of a general rule, governing all courts of equity.

BILL IN EQUITY. Decree dismissing the bill, from which complainant appealed. The case is stated in the opinion.

*Mr. W. Dessau* and *Mr. Clifford Anderson* for appellant.

*Mr. A. O. Bacon* and *Mr. John C. Rutherford* for appellees.

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit was brought by the widow of the late James A. Ralston, Jr., to obtain a decree cancelling certain deeds of gift of real estate, executed by her husband to the appellee, George B. Turpin, as trustee for his children. The original bill, filed August 7, 1883, sought this relief upon the ground that Turpin obtained the execution of the deeds by undue influence exercised by him over the grantor while the latter was in declining health, with a constitution seriously impaired by dis-

sipation, and by the suppression of facts that were within his knowledge, and which, in view of his relations to the grantor, he was under obligation to disclose.    In an amended bill, filed May 6, 1884, the grounds for cancellation were enlarged by an averment that at the time of signing the deeds the grantor was mentally incapable of comprehending and did not comprehend what he was doing, and that plaintiff gave her apparent consent to their execution, because, knowing Turpin's power "over her husband, she feared to offend him lest he might either work a separation between her and her said husband, or render their relations with each other insecure and unhappy;" and that "she and her husband were both overreached and deceived by the said Turpin, and yielded because they were in effect powerless to resist."    By a subsequent amendment, made May 29, 1885, the plaintiff alleged as to the first deed that neither she nor her husband knew, at the time of its execution, whether it was a will or a deed, or what its legal effect was, and that both of them were so completely under Turpin's influence, and so anxious to conciliate and gratify him, that they did not stop to consider its character or effect, and had no opportunity to consult counsel with reference thereto.    The answer put in issue all the material averments of the bill and amended bills.

The Circuit Court dismissed the suit, placing its decision upon two grounds: first, that when the deeds were made the grantor was capable of disposing of his property as he thought proper; second, that its disposition was in conformity with the long settled and cherished purpose of his life, and was not brought about by a betrayal of trust or any improper influence upon the part of the grantee.    25 Fed. Rep. 7.

The relations between the grantor and Turpin will appear from the following facts, some of which are conceded, while the others are established by a clear preponderance of evidence.

James A. Ralston, Sr., died in 1864, possessed of considerable property, principally real estate in Macon, Georgia, which passed, in equal parts, to his widow, and sole surviving child, James A. Ralston, Jr.    During the lifetime of the father, Tur-

pin attended to a large part of his business, and held towards him relations of close friendship and confidence. After his death the management of the estate was committed by the legal representative of the father to Turpin, who collected rents, leased property and directed necessary repairs. In 1867, the son, then about nineteen years of age, and having the right, under the laws of Georgia, to select his guardian, chose Turpin, without his solicitation, for that position. The latter qualified on the 2d of August, 1867. In the same year Mrs. Ralston, the mother, intermarried with Dr. Bozeman of New York.

On the 3d of May, 1869, Turpin, having made a final settlement of his accounts as guardian before the proper court, and turned over to his ward, who had then reached his majority, the property and assets belonging to the latter, received from that court a formal letter discharging him from the guardianship. Immediately after the relations of guardian and ward were thus severed, Turpin and his partner Ogden, composing the firm of Turpin & Ogden, were employed by young Ralston to take charge of his real estate, and to collect rents, make repairs, etc. In addition to the relations between him and Turpin, arising out of this employment, there existed between them a warm personal affection.

In 1873 the mother of Ralston died, leaving a will by which a considerable part of her estate was devised to him; and this, also, was committed by him to the management of Turpin & Ogden. By her will Turpin was made executor. He qualified, and, in 1878, having fully administered her estate, was discharged as executor. In this connection it may be stated that Mrs. Bozeman told Turpin that he was not remembered in her will, because " Jimmie had or would do so in his," she observing, at the time, that he had been a good friend to the family. This is stated by Turpin, in his deposition, and there is no reason to doubt the truth of his statement.

On the 11th of May, 1874 Ralston, being about twenty-six years of age and then competent to dispose of his property, and having an estate yielding him an annual income of about $15,000, made, at Macon, Georgia, and without suggestion by

Turpin, his will and testament whereby he directed that a monument, suitable to his condition and circumstances of life, be erected over his grave, and requested that his "friend, George B. Turpin, and his children after him," would see to it that his "monument and grave shall always during their lives be suitably kept and cared for." By that will he also directed, that after the payment of his debts his entire estate be divided into two equal parts; one part to go to George B. Turpin, in trust for the sole benefit and use of the testator's aunt, Mrs. Laura B. Smith, and her children, James, Annie, Daisy and Charles, during her natural life, and after her death, for the joint and sole use and benefit of those children, and their respective descendants, during the life of the child longest surviving, and upon the death of the last survivor, to the heirs at law of his aunt. The other part was devised to Turpin for the sole benefit and use of himself and children (born, and to be born) for and during his life; the trust to cease at his death and the property to vest in his children then in life, the descendants of any deceased child to share in the division *per stirpes.* Turpin and Ogden were constituted his executors.

On the 15th of December, 1879, Ralston, then nearly thirty-two years of age, made, at the city of New York, a second will, revoking all other wills, and devising to Turpin, "in trust for his children, William C. Turpin, Frank M. Turpin, George R. Turpin, Lizzie Turpin and Walter H. Turpin," the building at the corner of Cherry and Third Streets, in Macon, known as Ralston Hall, together with the adjoining lots, 66, 68 and 70, subject only to such liens and incumbrances as might be created thereon during his lifetime. This property is variously estimated to have been worth between $40,000 and $50,000, and constituted, at that time, according to the weight of the evidence, less than one half in value of his estate. He then devised to "Ida Blanchard, by which name she is now known, and whose original name was Sarah or Sally J. Harten, formerly of Philadelphia, Pa.," four stores in Macon, and all the watches and jewelry of which he should die possessed. To his aunt Mrs. Smith, during her natural life, and at her death to her children in fee simple, he bequeathed his undivided one

half interest in the Ralston mansion house in Macon. To his grandmother, during her natural life, he devised all of the family pictures of which he should die possessed, and at her death "to my friend, George B. Turpin, of Macon, Ga., having enjoyed his friendship for a long course of years. I feel that they will be safe and kept intact in his hands." To Ogden he devised all of the household furniture in the Ralston mansion house.

It is here necessary to state that the plaintiff, under the name of Ida Blanchard, went to Macon in 1869, and lived continuously in houses of public prostitution. While prosecuting that mode of life, young Ralston made her acquaintance, and for several years, without intermission, and much to the grief of relatives and friends, held improper relations with her. They often quarrelled and had drunken broils with each other in different places of bad repute where they met. During her residence in Macon, Turpin used every effort to induce Ralston to abandon the reckless and immoral life he was leading, and to cease the use of strong drink. But his efforts and warnings were unattended with success, except for brief intervals. No change occurred in the relations of Ralston and the plaintiff while in Macon. She states that he intended to marry her as far back as 1876. In the fall of 1879 they went to New York; and on the 23d of January, 1880, within less than three weeks after the will of 1879 was made, they were married. The fact of their marriage was not known in Macon until some months afterwards. In April, 1880, they removed to Stamford, Conn. In the summer of that year, Turpin, while at Saratoga Springs, received information of the marriage, and that they were living in Stamford. He went to the latter place in August, 1880, to ascertain if such were the fact, and, if it were, to inform Ralston that his marriage had, by the laws of Georgia, revoked the will made in favor of Turpin's children, and to suggest the propriety, if he still desired to do something for them, of making a formal deed for their benefit. There is some conflict between the statements of the plaintiff and Turpin as to what occurred at Stamford. But it is evident that nothing was said or done by Turpin, on that occasion, calculated to influence

Ralston or his wife to take any course not entirely in accordance with their wishes. Nor is there any ground to suppose that the plaintiff acquiesced in what her husband did from fear that Turpin might expose her course of life, or effect a separation between herself and husband. It does not appear that she stood in fear of anybody. It is clearly shown that, as the result of the interview at Stamford, Ralston and wife went to New York, and, before a commissioner of the State of Georgia, freely and voluntarily executed and acknowledged a deed, in fee simple, dated August 26, 1880, conveying to Turpin, as trustee for his children, William, Frank, George, Lizzie and Walter the identical property devised to him as trustee by the will of 1879, subject, however, to the condition that Ralston should receive annually its rents, uses and profits, after deducting taxes and insurance thereon, and expenses for collecting the rents and making repairs, and subject to a mortgage of $5000 made by Ralston to Ross, on one of the stores conveyed to Turpin as trustee. Two days afterwards, August 28, 1880, another deed, covering the same property and containing the same conditions, was executed and acknowledged by Ralston; the first deed having been discovered, or being supposed, to be informal in some respects. On the day of the execution of each of these deeds the plaintiff executed and acknowledged, before the same commissioner, a separate instrument in writing, stating that she freely and voluntarily ratified and confirmed the deed made by her husband.

In the year 1881, Turpin, having been advised by counsel that the former deeds for the benefit of his children were defective, in that their clauses, or some of them, were of a testamentary character, enclosed another deed for Ralston to execute, which the latter did on the 19th of April, 1881; the plaintiff executing on the same day a separate writing ratifying and confirming that deed, and renouncing and conveying to the trustee for the uses therein named all her right of dower and other interests in the property conveyed. This deed conveyed to Turpin in trust for his children named in those instruments the same property as that described in the will of 1879, and in the deeds of August 26, 1880, and August 28, 1880.

In this connection it may be stated that prior to the making of the will of 1879, Ralston became unfriendly to the husband of one of the daughters of Turpin, and, for that reason, she was omitted from that will as well as from all the deeds subsequently executed. He died at Montclair, New Jersey, on the 4th of July, 1883.

We must examine each of the principal grounds upon which the plaintiff bases her claim for relief, for, if, as contended, Ralston was in such condition, mentally and physically, when the deeds of 1880 and 1881 were executed, that he could not or did not comprehend the nature of the transactions, or if their execution was obtained by means of undue influence exercised over him by Turpin, in either case, the plaintiff would be entitled to relief. It would be granted upon the principle laid down in *Harding* v. *Handy*, 11 Wheat. 103, 125, which was a suit by heirs at law to set aside conveyances obtained from their ancestor. Chief Justice Marshall there said: "If these deeds were obtained by the exercise of undue influence over a man whose mind had ceased to be the safe guide of his actions, it is against conscience for him who has obtained them to derive any advantage from them. It is the peculiar province of a court of conscience to set them aside." *Allore* v. *Jewell*, 94 U. S. 506, 511. On the contrary, if it does not appear that he was incapable, by reason of physical or mental debility, of exercising a discriminating judgment in respect to the disposition of his property, or was driven to make the gifts in question against his own wishes, and under some influence that he was unable, no matter from what cause, to resist, the relief asked must be denied. "The undue influence for which a will or deed will be annulled," this court said in *Conley* v. *Nailor*, 118 U. S. 127, 134, "must be such as that the party making it has no free will, but stands *in vinculis.*"

In a case of conflicting proof, as here, it is a circumstance not without weight, that the plaintiff, who, more than any one else, was cognizant of the grantor's condition during the entire period in question, makes no averment in the original bill of the husband's want of capacity to dispose of his prop-

erty. The averment was that when the deeds were made he was in a declining state of health, and his constitution greatly weakened by dissipation. Such a condition does not, however, necessarily imply an absence of sufficient capacity to dispose of property, by gift or otherwise. Nearly a year passed after the institution of this suit, before she distinctly made the issue that the deeds were void for the want of capacity upon the part of her husband to make them. The proof does show, beyond question — indeed, it is admitted — that for many years prior to the execution of the deeds, and thenceforward until his death in 1883, he was intemperate in his use of ardent spirits. He was often intoxicated, and, when in that condition, was incapacitated to transact business. But for many years prior to his death there were intervals, some of them quite long, during which he avoided excessive indulgence in strong drink. His capacity, when sober, to transact business is abundantly shown. The vital inquiry is as to his capacity, not when he was intoxicated, but when the deeds were executed. *Conley* v. *Nailor*, 118 U. S. 127, 131. The evidence leaves no room to doubt that, at those particular dates he fully comprehended the character of those instruments. If it satisfactorily appeared that, from habitual dissipation or other cause, he was in such enfeebled condition of mind or body, immediately before or immediately after their execution, as to render him incompetent to transact business, the presumption might arise that he was unable, at the time, to understand what he was doing, and thus the burden of proof, as to his capacity, at those particular dates, to dispose of his property, be imposed upon the grantee. Even in that view, the plaintiff would not be entitled to a decree cancelling the deeds, on the ground of the grantor's mental incapacity; for it appears that, on each occasion when the respective deeds were executed, he was perfectly sober, and possessed sufficient capacity to dispose of his property with an intelligent understanding of what he was doing. He knew, at the time, that each deed conveyed certain property to Turpin in trust for the children named, and that they were substantially in execution of his settled purpose to make provision

out of his estate for the children of the man who had been for years the fast friend and confidential adviser of his parents and of himself. That purpose was based upon motives entirely creditable to him, and, so far as the record discloses was originally formed without any suggestion by Turpin or his children. Prior to his leaving Macon in 1879, and before making the will of that year, he often said to companions or acquaintances that he intended to make, or had made, such provision out of his estate.

If he executed the deeds of 1880 without knowing what he was doing, he would, naturally, at some subsequent time, have expressed dissatisfaction with what he had done, and taken steps to have them set aside. But no expression of dissatisfaction was ever made by him. On the contrary, upon receiving the deed of 1881, accompanied by the request that he would execute it, he promptly complied with that request, and returned the deed duly acknowledged by himself and wife to Turpin. His correspondence with the latter during 1880 and 1881 furnishes persuasive, if not conclusive, evidence that he had accurate knowledge of the condition of his property and its management by Turpin & Ogden, under the direction of Turpin, and was in the enjoyment of good health. On July 28, 1880, within less than a month before making the first deed of gift, he wrote to Turpin from Stamford, Connecticut, stating, among other things, that he was "enjoying good health." On April 18, 1881, the day preceding the last deed of gift, he wrote from the same place to Turpin, "my health is splendid, but Ida has been ill all winter and is so still." The body of each of these letters is in the handwriting of the complainant. They are inconsistent with her present contention that, not only at the time, but both before and after, the deeds of gift were executed, her husband's mind and body had been so wrecked by dissipation that he did not intelligently comprehend what he did, or possess sufficient will to resist the importunities or persuasion of others. To these considerations we may add the significant fact that in no one of the letters that passed between Turpin and the plaintiff, after the latter left Macon, is there any intimation that she disapproved of the

provision made for Turpin's children. We concur entirely
with the conclusion reached upon this issue by the court below.

It remains to consider whether the deeds of gift were the
result of undue influence exercised by Turpin over Ralston.
In discussing this question counsel for the plaintiff call atten-
tion to § 2666 of the Code of Georgia, which provides that "a
gift by any person just arrived at majority, or otherwise pecu-
liarly subject to be affected by such influences, to his parent,
guardian, trustee, attorney, or other person standing in a simi-
lar relationship of confidence, shall be scrutinized with great
jealousy, and upon the slightest evidence of persuasion or influ-
ence towards this object, shall be declared void, at the instance
of the donor or his legal representative, at any time within
five years after the making of such gift." We do not per-
ceive that this provision has any direct bearing upon this case.
There was here no gift by the ward just after he arrived at
his majority. If the deeds in question had been made imme-
diately upon Ralston's arriving at full age, or shortly after he
came into possession of his estate, they would, in view of the
then recent relation of guardian and ward, have been more
difficult to sustain. Still they would have been sustained if
it had appeared that they were freely and voluntarily made,
upon full knowledge of the facts, without misrepresentation or
suppression of material facts by the guardian. In *Hylton* v.
*Hylton*, 2 Ves. Sen. 547, 549, Lord Chancellor Hardwicke said:
" Undoubtedly, if after the ward or *cestui que trust* comes of
age, and after actually put into possession of the estate, he
thinks fit, when *sui juris*, and at liberty, to grant that or any
other reasonable grant by way of reward for care and trouble,
when done with eyes open, the court could never set that
aside; but the court guards against doing it at the very time
of accounting and delivering up the estate, as the terms; for
the court will not suffer them to make that the terms of doing
their duty." In the case before us more than eleven years
elapsed after Ralston attained full age, and after Turpin finally
settled his accounts as guardian, before the first of the deeds
of gift was made.

In respect to that settlement it may be observed that by

§ 1847 of the Georgia Code it is declared that "no final settlement made between the guardian and ward shall bar the ward, at any time within four years thereafter, from calling the guardian to a settlement of his accounts, unless it is made to appear that the same was made after a full exhibit of all the guardian's accounts, and with a full knowledge by the ward of his legal rights." Nothing is disclosed by the record that impeaches the entire accuracy of the guardian's final settlement; nothing that suggests any want of intelligence or integrity in his administration of the ward's estate ; nothing to show that he ever realized anything from the position of guardian, except such compensation as the law permitted him to receive. When, therefore, the relation of guardian and ward was severed, Ralston had every reason to confide in Turpin's integrity, and to feel grateful, not only for his uniform kindness, but for faithful devotion to his interests.

But it is contended that the relations subsequently existing between them were such as are described in § 3177 of the Georgia Code, which declares that "any relations shall be deemed confidential arising from nature or created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct and interest of another; or where, from similar relations of mutual confidence the law requires the utmost good faith, such as partners, principal and agent, etc." Undoubtedly, the relation of principal and agent existed between Ralston and Turpin after the relation of guardian and ward had been severed, and up to the death of Ralston. The section of the Georgia Code quoted is an expression of a general rule that has always governed courts of equity. The agent is bound to act with absolute good faith toward the principal in respect to every matter entrusted to his care and management. In accepting a gift from his principal he is under an obligation to withhold no information in his possession respecting the subject of the gift, or the condition of the estate in his hands, which good faith requires to be disclosed, or that may reasonably influence the judgment of the principal in making the gift. All transactions between them whereby the agent derives advantages beyond

legitimate compensation for his services will be closely examined by courts of equity, and set aside if there be any ground to suppose that he has abused the confidence reposed in him. It is for the common security of mankind, Mr. Justice Story well says, " that gifts procured by agents, and purchases made by them, from their principals, should be scrutinized with a close and vigilant suspicion." 1 Story's Eq. Jur. § 315. An instructive case upon this point is *Harris* v. *Tremenheere*, 15 Ves. 34, 38, which was a suit to cancel leases to a party who, at the time, held the relation of steward, agent, and attorney to the lessor. Some of the leases were pure gifts by the employer. Lord Chancellor Eldon disclaimed any jurisdiction to annul such gifts, when based upon the generosity of the donor, or to weigh the value or amount of the consideration, as if it had been the subject of barter, but said, that if he could find " in the answer or the evidence the slightest hint " that the defendant had laid before his employer an account of the value of the premises that was not perfectly accurate, he would set aside such leases. He would do this, he said, without regard to the intention of the parties, " upon the general ground that the principal would never be safe if the agent could take a gift from him upon a representation that was not most accurate and precise."

We do not intend to qualify or weaken, in any degree, these salutary doctrines. Their recognition, however, does not determine the present case, unless it be held that a principal cannot, under any circumstances whatever, make a valid gift to his agent of property committed to the latter's care or management. No such doctrine has ever been established, nor could it be, without impairing the natural right of an owner to make such disposition of his property as he may think would best subserve his interest and comfort or gratify his feelings. That Turpin held such relations, personal and otherwise, to young Ralston, as would enable him to exercise great influence over the latter in respect to the mode in which his property should be managed for purposes of revenue; that Ralston trusted Turpin's judgment as to matters of business more than the judgment of any other man; and that he had an abiding con-

fidence in Turpin's integrity, as well as in his desire to protect his interests, are conceded. But we are satisfied that Turpin did not improperly use the influence he had over, or abuse the confidence reposed in him by, young Ralston. It was the latter's own thought, induced, no doubt, by his friendly feeling for Turpin and gratitude for the latter's fidelity to his interests, to make some provision for Turpin's family. This thought was first formally expressed in the will of 1874, when he was capable of making a disposition of his property. It was substantially repeated in the will of 1879, drawn in precise conformity with his directions. The circumstances detailed by the plaintiff's counsel to show that the deeds of 1880 and 1881 were procured by undue influence upon the part of Turpin, lose most of their force in view of the fact that they covered the same property and name the same beneficiaries that are described in the will of 1879. That Turpin caused the first deed to be prepared, and requested Ralston to execute it, are facts of but little weight. Turpin had been informed of the will of 1879, and it was his right, if not his duty to his children, to inform Ralston that his marriage had revoked that will, and to suggest that, if he was so minded, the execution of a deed was an appropriate mode to give effect to his intention in respect to those children. Nor was the presence in Stamford, when the deeds of 1880 were executed, of Ogden, the partner of Turpin, a suspicious circumstance. The correspondence between Ralston and Turpin, prior to that time, shows that the former was aware of Ogden's purpose to visit the North during the summer of 1880, and desired Ogden to visit him at Stamford.

Upon a careful examination of the record, we concur with the court below in holding that the plaintiff has failed to show that the deeds of 1880 and 1881 were obtained by undue influence. On the contrary, it appears, by the great preponderance of evidence, (to state the case made by the defendants in no stronger language,) that, although their execution may have been induced, not unnaturally, by feelings of friendship for, and gratitude to, the defendant Turpin, the grantor acted upon his own independent, deliberate judgment, with full

knowledge of the nature and effect of the deeds. It was for the donor, who had sufficient capacity to take a survey of his estate, and to dispose of it according to an intelligent, fixed purpose of his own, regardless of the wishes of others, to determine how far such feelings should control him when selecting the objects of his bounty.

In respect to the allegation· that Turpin suppressed facts touching the condition of Ralston's estate, as affected by the claim of Mrs. Smith, it is sufficient to say that it is not sustained by the proof.

Other facts than those we have mentioned. are disclosed by the record, and other questions were discussed at the bar, but as they do not, in our judgment, materially affect the decision of the case, we need not specially refer to them.

*Decree affirmed.*