# MADRE v. GASKINS.

DEEDS; FRAUD; DURESS; UNDUE INFLUENCE; BURDEN OF PROOF; EVIDENCE.

1. Fraud, duress, and undue influence, alleged as grounds for setting aside a deed of conveyance, must be established by the party asserting them, although the relationship between the parties may have been such as to enable the grantee to exercise influence over the grantor.

2. A deed of conveyance made by an aged and infirm woman, who was nevertheless of strong mind and positive convictions, and who had long been separated from her relatives, in favor of one living with her, in consideration of support and attendance for life, will not be set aside at the suit of an heir at law, in the absence of coercion.

3. Confidential relations existing between grantor and grantee do not alone furnish any presumption of undue influence.

4. Statements made by a grantor since deceased, sufficiently near the date of the execution of the deed to form a part of the *res gestæ,* are admissible on the question of mental capacity, but not as proof of the truth of the statements declared.

No. 2397. Submitted April 23, 1912. Decided May 6, 1912.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia setting aside and vacating deeds of real estate.                    *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree in the supreme court of the District setting aside and vacating deeds of conveyance favorable to the appellant, the appellee, plaintiff below, being an heir at law of the deceased grantor.

The death of the grantor, Mary F. Newburn, occurred January 4, 1911, the cause being *arterio sclerosis.* She was then about seventy years of age. By doing washings, loaning out small sums of money from time to time, and by paying close attention to her affairs, she had become the owner of a small dwelling house of the value of about $1,600. This, and possibly two or three hundred dollars in the bank, constituted her estate. On December 24, 1910, the decedent deeded her house, in which she then lived with the appellant, whom we shall hereinafter designate as the defendant, to a third party, who thereupon, in accordance with the agreement theretofore made, executed a deed to the decedent and the defendant as joint tenants. On the same day, and just prior to the execution of the above conveyance, the decedent and the defendant executed an agreement by which the defendant, in consideration of said conveyance, agreed "to live with, care for, and furnish (at the cost and expense of the said party hereto of the second part), the said party hereto of the first part, for and during the natural life of the said party hereto of the first part, all the necessaries of life, including such nursing, medicine, and medical attention as may be required from time to time; and further to arrange for and pay the expenses incident to the proper comfort, peace of mind, and contentment of the said party hereto of the first part for and during the time aforesaid."

In her bill of complaint the plaintiff charged that the de-

fendant obtained said conveyance from the decedent through fraud, duress, and undue influence, and further that the decedent was mentally incapable of executing a valid deed or contract. The answer, of course, denied each of these averments. The plaintiff introduced several witnesses who had been acquainted with the decedent. Those witnesses testified, in a general way, as to conversations had with the decedent prior to the execution of said conveyance. The first of those witnesses testified that the decedent "said she wanted her brother's children to have the property." This witness was not asked concerning the mental capacity of the decedent. Nothing was elicited by the testimony of the second witness. The third witness was a tenant of the decedent from September 3 to November 21, 1910, living in the same house with her. This witness testified that the decedent had said that everything she had was to go to her blind brother and her niece, the plaintiff. This witness was not asked concerning the mental capacity of the decedent. On cross-examination this witness testified that, until the first part of October, the decedent had continued her work of washing and ironing, at which time she turned it over to the witness. The fourth witness, one Abbie B. Smith, testified that the last visit she made to the decedent was some time in October, and that the decedent "always told me that she wanted her property to go to her blind brother and her niece," and that the defendant "had done so many things that she disapproved of, she did not want her to have a penny at her death." This witness was not asked concerning the mental capacity of the decedent. The next witness, one Louise T. Holmes, had known the decedent for twenty-five years or more, and had seen her within two or three days of her death. Her last visit to the decedent was in response to a note from the defendant asking her to do so. Sometime in August or September the decedent, according to this witness, in response to a question as to what disposition she was going to make of her property, said in effect that her relatives were to have it. This witness further testified that the decedent and the defendant's mother had been very close and

warm friends. This witness was not asked as to the mental capacity of the decedent. The testimony of the next witness developed nothing favorable to the plaintiff, but it did develop that the plaintiff had taken some jewelry belonging to the decedent, and that the decedent procured its return. The next witness, one Josephine M. Coleman, had known the decedent fifteen or eighteen years, and testified that sometime prior to September the decedent had said she intended her niece, her blind brother, and her brother's children to have her property; that the defendant owed decedent about $600. This witness was not asked concerning mental capacity. The next witness, Sarah West, had known the decedent about twenty years, and last saw her within a few days of her death. Sometime in September, according to this witness, decedent said "after she was dead, she wanted her blind brother and his people to have her property." This witness was not asked concerning mental capacity. Agnes C. Forrest, the next witness, had been a neighbor of the decedent about five years, and had known her about seven years. Sometime in September, according to this witness, the decedent had said: "Should she be the shortest liver, she wanted this blind brother and his children to get whatever was left." A visit which this witness made to the decedent after her illness was in response to a request from the defendant. This witness also testified that the decedent had informed her of the indebtedness of the defendant to the decedent. This witness was not asked as to mental capacity. The plaintiff, Mary F. Gaskins, was the next witness. She visited the decedent for two weeks in November, 1910. The defendant was staying there nights at that time. In her direct examination the witness was asked as to the relations of the decedent and the defendant, and replied that decedent had said "they had been right good friends. She said Miss Madre's mother and her, meaning herself, had been friends from childhood. She said they all came from the same place and grew up friends together;" that the decedent had said she was going to get the money the defendant owed her, and then would have nothing more to do with her. This witness was not asked concerning

mental capacity. On cross-examination it developed that she had never seen her aunt until the spring of 1909. Witness said she had then been corresponding with her aunt about twelve months. It further developed that, except for seeing a daughter of one of her brothers upon a single occasion many years ago, and the plaintiff upon the occasion of her short visit, decedent had not seen any of her relatives for many years. The next witness was a Dr. William T. Gill, who was the medical director of the Capitol Benefit Society, and who, in his capacity as such, called at the home of the decedent in July, August, October, and December, to leave blanks to be filled out by the company's doctor. This witness testified that upon those occasions he considered the decedent "a feeble old lady. That was all;" that he paid no special attention to the case. The witness was unwilling to testify that upon the occasion of his last visit to the home of the decedent, she was not capable of making a contract involving the transfer of real estate. The next witness, Ernest L. Schmidt, Esq., an attorney at law, and, at the time he testified, president of the Lawyers' Title Company, had known the decedent five or six years before her death, and had acted for her professionally, but without compensation. "She was an old colored woman," said the witness, "that I felt myself free to give gratuitous advice to." He was then asked how the decedent regarded the defendant, and replied: "In the light of a friend Mrs. Newburn regarded Miss Madre, I should say. Mrs. Newburn herself was quite a strong-minded woman for a colored woman, and she manifested that strong-mindedness in her speech and general demeanor when she happened to be at my office." The witness had drawn two wills for the decedent, one prior to the death of Charlotte Madre, the mother of the defendant, which occurred in 1897, and the second a few months before the decedent's death. In the first will the decedent made some bequests to relatives in North Carolina, but left the bulk of her estate to the defendant's mother. In her second will the bulk of her estate was left to the defendant. The witness was asked to draw the deed of December 24th, but requested the decedent to get some other

attorney as he was busy.   Mr. Schmidt, however, at the re-
quest of the decedent, witnessed the third will, dated December
27, 1910.   In that will the decedent, after making two small
bequests, named the defendant as her residuary legatee.   The
witness was asked in his direct examination as to the physical
condition of the decedent at the time she executed this will,
and replied: "She was in bed, but she was in her right mind."
He was then asked whether she was feeble or not, and answered:
"She was in bed.   That necessarily implies she was physically
feeble, but she talked right straight and strong."   In cross-
examination Mr. Schmidt was asked whether, at the time, he
regarded the decedent as competent to execute a will, and re-
plied: "I certainly did, or I should not have witnessed it;"
that there was nothing in the conversation of the decedent to
indicate any weakening of mind, and that no coercion what-
ever was practised upon her.   The defendant was put upon the
stand by the plaintiff, and testified to her relations with the
decedent.   She denied that she owed the decedent any money.
In cross-examination it developed that, after the death of the
mother of the witness, Mrs. Newburn had taken care of her
for two years, and that their relationship thereafter was that
of mother and daughter, although there was no blood relation-
ship between them.   The witness denied practising any coercion
upon the decedent, and gave a reasonable and intelligent ac-
count of the execution of said conveyance.   Witness has been
a teacher in the public schools of the District for many years.

    The defendant produced as a witness the attorney, James
F. Bundy, who drew the deeds and contract out of which this
suit grew.   He testified in substance that he was sent for by
the decedent, drew the papers at her request and without any
suggestion or interference on the part of the defendant, who
was not even present or in the house upon the occasion of his
interview with the decedent.   This witness had known the
decedent and the defendant for about twenty years, during
which time their relations had been intimate.   While the wit-
ness was a member of the school board, the decedent had sought
a promotion for the defendant, and showed a decided interest

in her welfare. Several other witnesses were introduced by
the defendant, who testified concerning the mental capacity
of the decedent, including Dr. Edward D. Williston, who was
a witness to the will of December 27th, and who, up to October previously, had attended decedent professionally. The witness was asked the condition of mind of the decedent at the
time she executed this will, and replied: "Her mind was all
right. She was a very strong-minded woman; she was a particularly strong-minded woman." Dr. Samuel E. Watkins, the
physician in attendance at the time of the death of the decedent, was called by the defendant. He had treated decedent
from the 3d of November previously. At first she came to his
office, but later he treated her at her home. The doctor testified that the decedent was a very intelligent woman; that there
was no weakening of her mental faculties, and that he saw
nothing to indicate that she was under the dominion of anyone; that she did not take to her bed until the 10th or perhaps
the 15th of December. We deem it unnecessary further to
review the testimony.

*Mr. Arthur A. Birney,* for the appellant:

1. In the Federal courts the burden of proof to show undue
influence is always upon the plaintiff. *Conley* v. *Nailor,* 118
U. S. 127; *Towson* v. *Moore,* 173 U. S. 17; *Beyer* v. *Le Fevre,*
186 U. S. 114; *Leach* v. *Burr,* 188 U. S. 510; *Ralston* v. *Turpin,* 129 U. S. 663, 670; *Mackall* v. *Mackall,* 135 U. S. 167;
*Murray* v. *Hilton,* 8 App. D. C. 285; *Holtzman* v. *Linton,* 27
App. D. C. 257.

2. The decree should be reversed if for no other reason than
that the bill charges actual fraud, duress, and coercion, and the
court could find nothing more than constructive undue influence. *Murray* v. *Hilton,* 8 App. 285; *Eyre* v. *Potter,* 15
How. 42; *Dashiell* v. *Grosvenor,* 27 L.R.A. 67, 71.

*Mr. A. B. Webb* and *Mr. Joseph B. Stein,* for the appellee:

1. The. deed in question was one of bargain and sale, and requires a valuable consideration to support it. 3 Washb. Real Prop. 613; 7 Mackey, 590; 112 Mo. 641, 66 S. W. 621.

We contend that a relation of trust and confidence had existed between the deceased and the appellant; that, by reason of such trust and confidence reposed, the appellant obtained an undue advantage. *Frush* v. *Green,* 86 Md. p. 494; Odell v. *Moss,* 130 Cal. 352, 56 Md. 276; *Hatch* v. *Hatch,* 9 Ves. Jr. 292; *Sears* v. *Schafer,* 2d Seld. 268.

2. If the party acting be weak in mind and body, and there is either no consideration, or a very inadequate one, a presumption against the validity of the instrument arises. 141 Mo. 466; 2 Pom. Eq. Jur. sec. 947; *Allore* v. *Jewell,* 94 U. S. 506.

. 3. We contend that the facts in this case, as interpreted by the weight of authorities, prove that a relation of trust and confidence existed between the deceased and the defendant prior to her death; that, by reason of the deed in question, a presumption of undue influence is raised (on account of the gross inadequacy of the consideration), and thereby the burden shifts from the plaintiff to the defendant, to prove to the satisfaction of. an ordinary mind that the particular transaction was the voluntary act of the grantor. Pom. Eq. Jur. p. 513; 47 U. S. p. 676; 35 Fed. 243; 78 Fed. 536.

4. All the declarations of the deceased as to the disposition of her property are competent for the purpose of showing undue influence or mental incapacity, . deeply rooted feelings, opinions, affections, or prejudices, and settled convictions. Aside from this, these prior declarations as to the disposition of her property between her relatives are admissible, because a foundation has been already laid by proving the gross inadequacy of the consideration, and therefore these declarations can be considered, together with the gross inadequacy of the consideration, to prove undue influence or mental incapacity. 99 Mass. 88; 141 Mass. 329; 9 Ga. 60; 53 S. W. 295; 19 Neb. 799.

Mr. Justice ROBB delivered the opinion of the Court:

The testimony above briefly outlined amounts to about this: The decedent, a woman evidently of strong mind and positive convictions, was sufficiently fond of defendant's mother to name her as the principal beneficiary in her will. Upon the death of the defendant's mother, the decedent herein evidently transferred her affection to the defendant, and the evidence leaves no room for doubt that the character of that relationship continued unchanged from that time on; and it was most natural in the circumstances. The decedent had no children of her own and had long been separated from her relatives. Becoming infirm physically, and being unable longer to pursue her calling, it was not unnatural that she should desire to make definite plans for the future. There is not a *scintilla* of evidence that any coercion whatever was practised upon her. For aught that appears in the record, the arrangement that resulted was not only entirely voluntary on the part of the decedent, but one initiated by her. Assuming that the relationship between the decedent and the defendant was such as to enable the latter to exercise influence over the former, and hence to require that any disposition by the former of her property for the benefit of the latter should be closely scrutinized, it nevertheless remains true that the burden is upon the plaintiff to establish her case; in other words, the rule in this jurisdiction places the burden of proof in such a case upon the plaintiff. *Jenkins* v. *Pye,* 12 Pet. 241, 9 L. ed. 1070; *Conley* v. *Nailor,* 118 U. S. 127, 30 L. ed. 112, 6 Sup. Ct. Rep. 1001; *Ralston* v. *Turpin,* 129 U. S. 663, 32 L. ed. 747, 9 Sup. Ct. Rep. 420. In the last case the bill was to set aside deeds made to an agent by his principal, and it was conceded by the court that the relations between the parties were such as to enable the agent to exercise great influence over the principal. Notwithstanding this the bill was dismissed because the plaintiff had failed to show that the deeds were obtained by undue influence. In *Mackall* v. *Mackall,* 135 U. S. 167, 34 L. ed. 84, 10 Sup. Ct. Rep. 705, it was ruled that, while the relationships between the

father and son were such as to suggest influence, they did not prove *undue* influence, the court saying: "Influence gained by kindness and affection will not be regarded as 'undue,' if no imposition or fraud be practised, even though it induce the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. * * * Confidential relations existing between the testator and beneficiary do not alone furnish any presumption of undue influence." After reviewing the evidence, the court, in *Towson* v. *Moore,* 173 U. S. 17, 43 L. ed. 597, 19 Sup. Ct. Rep. 332, ruled that the existence of confidential relations between donor and donee, or grantor and grantee, require a careful scrutiny of the circumstances attending the transaction, to ascertain whether undue influence has been practised. But, said the court, "it [the gift or conveyance] cannot be deemed prima facie void; the presumption is in favor of its validity; and, in order to set it aside, the court must be satisfied that it was not the voluntary act of the donor." This doctrine was repeated in *Beyer* v. *LeFevre,* 186 U. S. 114, 46 L. ed. 1080, 22 Sup. Ct. Rep. 765.

The evidence of the plaintiff in the present case, notwithstanding the sweeping and almost reckless averments of her petition, amounts to little. Many of the alleged statements of the decedent concerning the disposition of her property were made at a time so remote from the execution of the deeds in question as to be inadmissible upon any theory. Assuming that some of them were made at a time sufficiently near the date of the execution of these deeds as to form a part of the *res gestæ,* and hence were admissible on the question of mental capacity, the great preponderance of evidence in the case shows not only mental capacity, but the absence of all undue influence. Such "declarations are to be admitted, not in any manner as proof of the truth of the statements declared, but only for the purpose of showing thereby what in fact was the mental condition, or, in other words, the mental capacity, of the testator, at the time when the instrument in question was exe-

cuted. * * * It is quite apparent, therefore, that declarations of the deceased are properly received upon the question of his state of mind, whether mentally strong and capable, or weak and incapable, and that from all the testimony, including his declarations, his mental capacity can probably be determined with considerable accuracy." *Throckmorton* v. *Holt,* 180 U. S. 552, 572, 574, 45 L. ed. 663, 673, 674, 21 Sup. Ct. Rep. 474.

The evidence to our minds so conclusively disproves the averments in plaintiff's bill that we deem it unnecessary to dwell further upon it, and therefore reverse the decree, with costs, and remand the cause with directions to enter a decree for the defendant.                                        *Reversed.*