**207 P.2d 1008**

**OSTIC et al. v. MACKMILLER et al.**

**No. 5172.**

Supreme Court of New Mexico.

June 29, 1949.

Shipley & Shipley, Alamogordo, for appellants.

Roy T. Mobley, Alamogordo, for appellees.

BRICE, Chief Justice.

This action partakes of the nature of one to quiet title; in ejectment; for cancellation of instruments; and an accounting for rents; all as one alleged cause of action.

Plaintiffs, in their brief, seem to treat it as an action in ejectment.

At the close of plaintiffs' testimony defendants moved for judgment, asserting that plaintiffs had not proved the cause (or causes) of action pleaded. This motion called for a declaration of law, to-wit:

■ Accepting as true that part of the testimony that supports plaintiffs' case, together with all favorable inferences that can reasonably be drawn therefrom, considered in a light most favorable to plaintiffs, and discarding all adverse testimony, had a case been made that would support a judgment for plaintiffs? Union Bank v. Mandeville, 25 N.M. 387, 183 P. 394; Bezemek v. Balduini, 28 N.M. 124, 207 P. 330; Telman v. Galles, 41 N.M. 56, 63 P.2d 1049; Merchants Bank v. Dunn, 41 N.M. 432, 70 P.2d 760; Paulos v. Janetakos, 41 N.M. 534, 72 P.2d 1. This motion was sustained by the trial court and plaintiffs' complaint was dismissed.

The question is whether, under the rule stated, facts were proved that will support a judgment for plaintiffs. If so the trial court erred in sustaining the motion; otherwise the judgment should be affirmed.

There was evidence to support the following facts:

(1) The plaintiffs became owners of the property in suit, as heirs of their mother, Petra Ostic Coronado, who died in 1924, at which time the plaintiffs were all minors.

(2) The defendant, Ramona O. Mackmiller, who was the sister of plaintiffs' father, was appointed their guardian by the Probate Court of Otero County, New Mexico, in 1924. The youngest of these children became of age on January 11, 1941.

(3) The defendant Mrs. Mackmiller filed her final report as guardian in the Probate Court of Otero County in 1946, and thereafter the guardianship proceedings were removed to the district court of that county, but she has not yet been discharged nor has her report been approved, and the proceedings are still pending in the district court.

(4) The property in suit was occupied by one or more of the plaintiffs from the time of the death of their mother in 1924 until 1940, in which year it was placed under the care and management of the defendants.

(5) The plaintiff Eva Ostic Torres paid the taxes on the property for the years of 1932 to 1936, inclusive, as they accrued; and she rendered the property for taxation in her name for the years of 1937 to 1940, inclusive.

(6) On the 10th day of December, 1941, the plaintiff William Ostic entered into a written contract with defendants, by the terms of which he agreed to sell to defend-

ants the property in suit for $200.00; $30.-00 of which was paid in cash, the balance to be paid in twelve monthly installments, with five percent interest, beginning January 1942. These payments ranged from $14.18 to $15.07. The defendants paid the January and February installments of $14.-70 and $14.65 respectively, but made no payments thereafter.

(7) Among the terms of this contract the plaintiff William Ostic agreed to convey to the defendants the property in suit by warranty deed, free and clear of all incumbrances, and to furnish a "complete abstract of title brought down to date" within thirty days from date of the contract. Deed was to be delivered in December, 1942, presumably when the last payment was due. In case title on examination should prove to be defective, Ostic agreed to perfect it in a reasonable time, or in case of failure to do so, or if the title could not be perfected, the cash paid should be refunded and the contract should be null and void.

(8) On December 9, 1938, the property in suit was sold for the taxes levied against it for 1937, and a tax certificate was issued thereon. The property was not redeemed from tax sale, and on February 25, 1941, a tax deed was executed and delivered to the State of New Mexico conveying to it the land in suit.

(9) Thereafter, without plaintiffs' knowledge, the defendants paid to the State Tax Commission the sum of $7.38 and received from it a tax deed conveying the property to them.

(10) After receiving the tax deed the defendants claimed title under it and repudiated the contract and refused to carry out its terms. They never advised plaintiffs that they claimed title under the tax deed until 1944; at which time this information was given as defendants' reason for refusing to make the payments under the contract. This was plaintiffs' first knowledge that the property had been sold for taxes.

(11) The plaintiff William Ostic did not furnish an abstract of title as required by the contract, and defendants did not request that it be furnished to them.

(12) The plaintiffs by bringing this action accepted the defendants' repudiation of the contract, and thereupon it was terminated.

(13) The plaintiffs, other than William Ostic, orally agreed to the contract of sale made by him, and considered it as their contract.

The question then is whether the defendants' tax title is valid as against the plaintiffs, some of whom were minors and her wards at the time the tax was levied, at the time it became delinquent, and at the time the property was sold for taxes; and

when at the time of the purchase of the tax title the guardianship proceedings as to all the plaintiffs were still pending in the probate court.

The duties of a guardian of minors in this state are stated as follows:

"Guardians shall have the care of the person of the ward, and the possession and management of his estate, both real and personal, and shall have authority to receive, and, as guardian, to sue for all debts, rents, accounts and property, real and personal, due and belonging to the ward; and to sell, under the direction of the court, the personal property of the ward." Sec. 35-115, N.M.Sts.1941.

"When any ward shall be the owner of any improved lands, it shall be the duty of the guardian of such ward annually, to rent such lands to the best advantage, and the guardian shall take bond and security for the payment of the rent, and that the renter will not commit waste on the premises rented." Sec. 35-116, N.M.Sts.1941.

"Any district court having jurisdiction may authorize a guardian of the estate of any minor to borrow money and to mortgage the estate of such minor, when it shall be necessary to pay debts, or for the support, maintenance and/or education of the minor, or for the best interests of the estate of such minor, or to conserve the estate." Sec. 35-125, N.M.Sts.1941.

That it was the duty of Mrs. Mackmiller as guardian of the minors to preserve the estate from tax sale if she could have obtained funds of theirs which could have been so used, there can be no question. The taxes on the property were about $3 per annum, and from the testimony we are of the opinion that the property could have been rented for more than 25¢ per month. One of the plaintiffs paid the taxes for several years, but this did not relieve Mrs. Mackmiller from protecting the property against loss by tax sale, as long as any of the children were minors and she was guardian, if funds of theirs could have been obtained for that purpose.

In 1924 Mrs. Mackmiller received the proceeds of an insurance policy in the sum of $1000, payable to the plaintiffs. At that time the oldest of the plaintiffs was sixteen years of age and the youngest four. She was authorized to expend $40 per month for the support and maintenance of the plaintiffs. She has never made any annual report to the court of how this money has been used; and made her final report or accounting on the 27th day of March, 1946 twenty-two years after she was appointed guardian.

The property was sold to the state for taxes before the youngest of the plaintiffs had reached his majority, and while the guardianship proceedings as to all of the plaintiffs were still pending. The following equitable rules are involved.

██ "The equitable rules concerning dealings between guardian and ward are very stringent. The relation is so intimate, the dependence so complete, the influence so great, that any transaction between the two parties, or by the guardian alone, through which the guardian obtains a benefit, entered into while the relation exists, are in the highest degree suspicious; the presumption against them is so strong that it is hardly possible for them to be sustained. Indeed, many authorities lay down the positive rule that the parties are wholly incapacitated from contracting, and that any such transaction between them is necessarily voidable. This statement is perhaps too broad. The doctrine applies to purchases made by guardians of ward's property, when sold by order of court, or at other judicial or public sales; such purchases are generally held voidable, and are clearly so in principle. A will by the ward in his guardian's favor is not viewed so strictly; the presumption against it may be overcome and the will sustained." Pomeroy's Equity Juris. 5th Ed., Sec. 961.

██ "The general doctrine of equity applies to the parties after the legal condition of guardianship has ended, and as long as the dependence on one side and influence on the other presumptively or in fact continues. This influence is presumed to last while the guardian's functions are to any extent still performed, while the property is still at all under his control, and until the accounts have been finally settled. It follows, therefore, that any conveyance, purchase, sale, contract, and especially gift, by which the guardian derives a benefit, made after the termination of the legal relation, but while the influence lasts, is presumed to be invalid and voidable. The burden rests heavily upon the guardian to prove all the circumstances of knowledge, free consent, good faith, absence of influence, which alone can overcome the presumption. (It is not necessary in such cases that actual and intentional fraud be established. It is sufficient that the guardian gains some advantage by the transaction with his ward." Pomeroy's Equity Juris., 5th Ed., Sec. 361a.

██ It was the guardian's duty under these circumstances to have kept herself informed regarding the tax conditions, and to have used reasonable diligence toward having them paid. The least that could have been required of her, was to have kept the plaintiffs, who lived in California, informed of the threatened danger to their property, so they could have protected themselves against a sale if she could not do so.

The tax conditions were apparently not known to plaintiffs at the time the contract of sale and purchase was made. Whether the actual conditions were known to defendants at that time, we are not informed by the record. But within two months

thereafter Mrs. Mackmiller had repudiated the contract, and was claiming under the tax title which her negligence had been a factor in creating.

Now, notwithstanding Mrs. Mackmiller's negligence as stated, if the contract was fair and equitable she was not prohibited from protecting her title by securing the state's tax deed. But she could not thereafter repudiate her contract with plaintiffs and claim title under the tax deed which cost her less than ten dollars, and thus enrich herself at the expense of those who trusted her, and to whom she owed fiduciary duties.

Her refusal to pay the installments due on the contract after the tax title purchase, and her claim of title under the tax deed were a repudiation of the sale and purchase contract.

"In general, any person legally qualified to contract may become the purchaser at a tax sale unless he has some duty to perform in reference to the sale inconsistent with his character as purchaser, or occupies a position in reference to the property that will make his individual interest as a purchaser inconsistent with his duties. There are, however, many persons who, by reason of their interest in the premises and their relationship to others interested therein, may not, for equitable reasons, become purchasers. Persons occupying fiduciary relationships, such as agents, attorneys, guardians, trustees, etc., may not violate their trust by becoming purchasers at a tax sale of the trust property. * * *" 51 A.J. "Taxation" Sec. 1053

"It is a general principle of law that one who by virtue of an existing legal or contractual relation with another is under an obligation to such other person to pay the taxes on lands, but who omits to pay such taxes, cannot be allowed to strengthen his title to such land by buying in the tax title when the property is sold as a consequence of his omission to pay the taxes on it; his purchase at the sale will merely operate as a payment of the taxes, and the title will be the same as it was before the sale, except that the lien for taxes is discharged. * * * One who acquires property through or under a tax sale proceeding in violation of this principle and whose title may for this reason be defeated at the instance of those for whose protection the rule was devised cannot cut off the latter's rights by conveying the property to a third person, even though he may be a bona fide purchaser.

"The effect of the principle which precludes one under obligation to pay taxes from becoming the purchaser at a sale for delinquency in payment of taxes cannot be evaded by such person by allowing the property to be sold to a third person and then purchasing it from him, by organizing

a corporation and causing the tax deed to be made to it, or by any other collusive arrangement which would directly or indirectly defeat the operation of the rule.

"When property is purchased at a tax sale by the husband of one whose interest is such that she cannot acquire a paramount title herself, he is deemed in most jurisdictions to have represented her in making the purchase, and the purchase will operate merely as a payment of the tax, * * *." 51 A.J. "Taxation" Sec. 1054.

We note also that defendants prepared the contract. It was dated December 10, 1941, just one day after the two-year right of redemption had expired.

■ Mrs. Mackmiller was the sister of plaintiffs' fâther, and at the time was an unreleased guardian of all the plaintiffs. The purchase of the tax title under the facts stated will be treated as a payment of taxes.

The defendants were husband and wife and acted in concert to secure the tax title. The fact that he was not a guardian is immaterial.

■ If property is purchased by the husband of one whose interest is such that she cannot acquire a paramount title herself, he is deemed as representing her in making the purchase, and the purchase will operate as payment of taxes. Rothwell v. Dewees, 2 Black. 613, 17 L.Ed. 309. Regarding the effect of a tax title bought by the husband of one tenant in common on the estate of the other, it was said in Robinson v. Lewis, 68 Miss. 69, 8 So. 258, 259, 10 L.R.A. 101, 24 Am.St.Rep. 254:

"If the rule which prevents one spouse from securing a title where the other is disqualified rested only upon a supposed privity of estate between them, it might well be argued that our statutes upon the subject have destroyed its foundation. But the rule is founded upon considerations of public policy, and conclusively imputes to the one, as derived from the other, knowledge of those facts the existence of which precludes the other from action. The opportunities that would be afforded for fraudulent practices would be so numerous, and the difficulty of exposing them so great, that courts apply the doctrine of estoppel to both, and thus close the door that offers the temptation."

The contract of sale and purchase involved, terminated when the plaintiffs accepted defendants' repudiation of it, New Mexico-Colorado Coal & Min. Co. v. Baker, 21 N.M. 531, 157 P. 167; U. S. Potash Co. v. McNutt, 10 Cir., 70 F.2d 126, and an action for its breach was immediately authorized. New Mexico-Colorado Etc. Co. v. Baker, supra; Lakeshore & M. S. R. Co. v. Richards, 152 Ill. 59, 38 N.E. 773, 30 L.R.A. 33, and Anno.

The judgment of the district court should be reversed and cause remanded with instructions to the district court to set aside its judgment, overrule defendants' motion for judgment, and proceed with the trial and disposition of the cause not inconsistent herewith.

It is so ordered.

LUJAN, SADLER, McGHEE, and COMPTON, JJ., concur.