700 P.2d 1389

**Jerry W. EAGERTON, Appellant,**

v.

**Robert B. FLEMING, Pima County Public Fiduciary, as Guardian for the Estate of Millard Eagerton, Appellee.**

**No. 2 CA–CIV 5160.**

Court of Appeals of Arizona, Division 2, Department A.

April 29, 1985.

R. Lamar Couser, Tucson, for appellant.

Robert B. Fleming, Pima County Public Fiduciary by Elizabeth Anne Upham, Tucson, for appellee.

## OPINION

HOWARD, Judge.

The two questions considered in this appeal are whether appellant had a fiduciary duty to his father when his father gratuitously conveyed to him a parcel of real property and, if so, whether appellant's receipt of the property and personal use of the proceeds of the subsequent sale constituted a breach of that duty, invoking a constructive trust for the benefit of his father's estate. The trial court surcharged appellant in the amount of $4,000—the entire net proceeds from the sale. We affirm.

In 1969, at approximately age 50, Millard Eagerton sustained head injuries that resulted in organic brain damage. Those injuries necessitated temporary hospitalization and, although they have never caused an adjudication of mental incompetency, they apparently have rendered him permanently unable to adequately manage his finances or to administer to himself the medications required to treat his various ailments. For several years he has been suffering from heart and lung problems, ulcers, diabetes, and dementia and cirrhosis of the liver due to alcohol abuse. Millard

Eagerton has four children, one of which is appellant.

Prior to 1979, appellant's three siblings apparently "took turns" looking after their father, although there is evidence that they did not exercise consistently effective control, for at one time the man was alleged to have been living "under the Congress Street bridge" in Tucson. In 1979, appellant, who testified he had little to do with his father until that year, established a checking account in which he deposited his father's monthly disability and Social Security income and a worker's compensation lump sum back payment of $5,000. Appellant used monies from the account to pay for his father's rent, groceries and utilities in a Tucson apartment.

In 1980 Millard Eagerton gained title by intestate succession to a small parcel of rural land in Alabama and left Arizona to take up residency in a four-room house that had stood on the land for generations. The record is unclear as to how appellant's father traveled to Alabama, or whether he did so with appellant's approval, but it is clear that soon appellant was called upon to go to Alabama to assist his father by paying off debts incurred in the community and making substantial repairs to the plumbing to render the house fit for habitation. Appellant stated in an affidavit that the structure was run-down and decrepit and that "my Dad had chickens and dogs living in the house with him." Appellant stayed a few days while engaged in setting his father up in housekeeping and then returned to his seven-day-per-week self-employment as a janitor in Tucson.

Eleven months later, in February 1981, appellant returned to Alabama for three days to put his father in the hospital there for treatment of congestive heart failure. Appellant again went back to his work in Tucson.

Near the end of Millard Eagerton's stay in the Alabama hospital, on the day before he was to move to a nursing home, he deeded his Alabama property to appellant, allegedly out of gratitude for his son's assistance and affection. The deed, prepared

by an attorney, was acknowledged and recorded. Appellant was in Tucson at the time of the conveyance and apparently learned of it only after the fact—when he received the deed in the mail.

Approximately one month after his father's hospitalization, in March 1981, appellant traveled a final time to Alabama and brought his father back to Arizona. Almost immediately upon returning to Arizona, Millard Eagerton was admitted to the Arizona State Hospital in Phoenix. At that time, appellant applied for and was granted official guardianship of his father, who was found to be an incapacitated person. The order was entered in July 1981.

Sometime thereafter, within a few months of acquiring title to the land, appellant learned of an offer of purchase for the net sum of $4,000. Aware that the property lay in a depressed area and that the price was probably the best that could be expected, appellant accepted the offer, executing the documents by mail. He used the proceeds for his own purposes.

One year after his initial appointment, appellant petitioned for reappointment as guardian. Appellant's petition precipitated an objection by one of appellant's siblings, which resulted in the appointment of an attorney as guardian ad litem and eventually led to the judgment from which this appeal is taken. When the guardian ad litem was appointed, appellant withdrew his petition for reappointment and submitted an accounting of the period of his official tenure as guardian.

The guardian ad litem visited Millard Eagerton at his place of residence at the time—a "home" in Phoenix, operated by Jackson & Sons. Eagerton had been living at the Jackson facility following his release from the Arizona State Hospital. During the visit, Millard Eagerton told the guardian ad litem that he was "concerned about his Alabama property." In January 1983, on the basis of this and other information, the guardian ad litem filed an objection to appellant's accounting and requested a hearing, alleging insufficient description of many of the entries, including maintenance expenses, debts paid, and any compensation received by appellant for services rendered. The court subsequently entered an order finding that Millard Eagerton remained in need of a guardian and conservator and appointed the public fiduciary to render those services.

The court further found that appellant had been acting as de facto conservator of his father's estate prior to the official appointment and ordered appellant to update his first accounting and to supplement it with an accounting of the six-month period of de facto conservatorship, including any assets of more than $100 that might have passed through appellant's hands. The court set a trial date for testimony on the new accounting. In the interim, the public fiduciary filed further objections to appellant's accounting, of which only the alleged non-disclosure of the Alabama real property asset is of consequence to this appeal.

Appellant's position at trial was that he had acquired title in a proper inter vivos gift transaction between father and son. Appellant pointed out that he was not present when the deed was executed and claimed that he had no knowledge of the conveyance until the deed arrived in the mail. He submitted an affidavit from the notary who witnessed the signing in Alabama to the effect that the conveyance appeared to be voluntary. The trial court held that a presumption of undue influence arose because appellant had a fiduciary relationship with his father at the time of conveyance. Finding that appellant had failed to overcome the presumption with clear and convincing evidence, the court surcharged appellant in the amount of the proceeds.

I.

A parent-child relationship does not in itself give rise to a confidential or fiduciary relationship. *Amado v. Aguirre*, 63 Ariz. 213, 161 P.2d 117 (1945); see *En-*

*glesby v. Nisula,* 99 Idaho 21, 576 P.2d 1055 (1978); *Roybal v. Morris,* 100 N.M. 305, 669 P.2d 1100 (App.1983). However, confidential relations may be said to exist wherever trust and confidence is imposed in one person in the integrity and fidelity of another. *Faulkner v. Beatty,* 161 Cal. App.2d 547, 327 P.2d 41 (1958). The existence of a confidential relationship is a question of fact. *In re Chandos,* 18 Ariz.App. 583, 504 P.2d 524 (1972). The burden of proving a fiduciary relationship between the donor and the donee rests upon the party attacking the gift. *Amado v. Aguirre,* supra. Here, appellant took control of Millard Eagerton's finances in 1979, two years prior to the conveyance at issue. He opened an account in which he deposited his father's funds and from which he drew to pay his father's expenses. He arranged for payment of debts which his father contracted in Alabama and he traveled there, apparently by request, to look after his father on more than one occasion. The trial court found that appellant was a de facto conservator from the time that he opened the account in 1979 until he became official guardian, after the conveyance, in 1981. We agree that the evidence is sufficient to support the finding that a fiduciary relationship existed at the time of conveyance, even though appellant was not in Alabama when the deed was executed.

## II.

▆ The existence of the de facto conservatorship having been established by the trial court, the gift by the ward, Millard, to his son, Jerry, is presumed to be invalid.[1] *In re Chandos,* supra. *Ostic v. Mackmiller,* 53 N.M. 319, 207 P.2d 1008 (1949); 39 C.J.S. Guardian & Ward § 85 (1976). The burden of proof was, therefore, on appellant to show that the gift was made freely and voluntarily, with full knowledge of the facts. See *Ralston v. Turpin,* 129 U.S. 663, 9 S.Ct. 420, 32 L.Ed. 747 (1889). The main evidence on this issue came from appellant, whom the trial court did not have to believe since he was an interested party. See *Carrasco v. Carrasco,* 4 Ariz.App. 580, 422 P.2d 411 (1967). The weight to be given to the notary's affidavit was for the trial court. We conclude that the state of the evidence justified the trial court's finding that appellant did not sustain his burden of proof.

Affirmed.

BIRDSALL, P.J., and FERNANDEZ, J., concur.

---

1. This presumption does not apply in all confidential relationships. See, for example, *Stewart v. Woodruff,* 19 Ariz.App. 190, 505 P.2d 1081 (1973) (confidential relationship between 80-year-old grantor and his nephew).