AUGUSTUS J. MERCIER, plaintiff in error, *vs.* GEORGIA A. MERCIER, defendant in error.

[This case was argued at the last term and decision reserved.]

A verbal contract between two children, made during the life of the father, by which they sought to avoid the disinherison of one of them, which was threatened by the father, should a marriage contemplated by said child take place, by which they agreed to divide the property between them, no matter what might be the parent's will, cannot be enforced in equity on a bill for specific performance. (R.)

Specific performance. Wills. Parent and child. Contracts. Before Judge CLARK. Early Superior Court. April Term, 1873.

Georgia A. Mercier filed her bill against her brother, Augustus J. Mercier, charging, in substance, that in 1868, her father, George W. Mercier, died testate, and by his will gave his whole estate, with nominal exceptions, to complainant's brother, who had taken possession of the same; that in 1863, her brother, much against her father's will, was engaged to be married to his present wife; that the father threatened to disinherit the son if he persisted in his intention, and that he would give him nothing during the father's life, or at his death, but would give all his property to complainant; that complainant favored the marriage, and her brother proposed to her, that if she would agree, in the event that their father did give her his property, to divide it with him, "he would brave his father's anger and consummate his intention towards the lady to whom he was then engaged, and that should

their father afterwards relent towards his son and for any cause give him all his property, then he would do the same by complainant as he asked of her to do by him ;" that her brother urged this proposition on her, as their father was of irate and hasty temper, and there would be a large property for both ; that complainant was induced by this, and by the further fact that the betrothed of her brother would not consummate the marriage on account of said threat of her father, unless complainant would accede to the proposition of her brother, to agree with him that they would equally divide between them the property of their father, at his death, without regard to which one it might be given ; that a short time after the understanding thus made complainant's brother did marry the young lady to whom he was engaged ; that the father afterwards made his will as above stated, and her brother refuses to carry out said agreement ; that this contract was made without the knowledge of the father, and was kept secret from him, unless the brother fraudulently disclosed it.

It is not charged in the bill that he did disclose it, or that the father ever heard of it.

The bill prays for a specific performance.    A demurrer was filed on the following grounds :

1st.  Want of equity.

2d.  That the interest of the parties in the subject matter of contract set forth was too remote and contingent to support a contract.

3d.  That the alleged contract is illegal, immoral and contrary to public policy ; and,

4th.  The statute of frauds.

It was admitted that the contract set up in the bill was by parol.

The demurrer was overruled, and defendant excepted.

JOHN C. RUTHERFORD;  A. HOOD;  J. E. BOWER, for plaintiff in error.

H. &. I. L. FIELDER, for defendant.

TRIPPE, Judge.

It may truly be said in this case, as was remarked by Lord Eldon in the case of Gordon *vs.* Gordon, 3 Swanston, 400, which bears some resemblance to this : " I have never known a case in which it was more the duty of a Judge to make a covenant with himself not to suffer his feelings to influence his judgment." But outside of what may be considered the personal or private obligations between these parties, or as to what would be right between a brother and sister, there is a cardinal principle involved almost of universal application, and which is fatal to complainant's case. It is that which is raised by the third ground taken in the demurrer. That ground is, that "the alleged contract is illegal, immoral and contrary to public policy."

It is not denied that it has been frequently held, both in English and American cases, and by this Court, that parties interested in the estate of a deceased person, or who have expectations of being such, may contract between themselves as to how the same shall be divided, if the contract be fair and without fraud. But in nearly all of those cases the decisions are put on the ground, either that the agreements had been made to avoid or settle family controversies, to adjust doubtful rights, to preserve the harmony and affection or honor of the family, or that there was a valuable consideration. I will refer to a number of them : *Watkins vs. Watkins,* 24 *Georgia,* 402, was a case of an agreement to settle a doubtful right, and to prevent a family controversy. The father had died, and some of the children were about to caveat his will. In *Fulton vs. Smith,* 27 *Georgia,* 413, the agreement recited that the father had divided his property unequally, which was not his intention when he was of a sound and disposing mind, and for that and other reasons stated, the children made a special agreement, which was enforced. So in *Smith vs. Smith,* 36 *Georgia,* 184, the father had died, and the heirs were in doubt whether there was a will. One of them knew there had been a will about a year previous. He was almost the

sole legatee under it, and he had been officious in getting it up. In his presence, the other heirs, who had heard of the will, were discussing the matter, and one of them denounced such a paper as a fraud procured by the chief legatee in it, and declared that its probate would be resisted. In this state of matters, as the bill charged, the agreement for a certain division was executed between the heirs. The will was afterwards produced by the son who was the chief beneficiary under it, and who refused to abide by the agreement. On a bill filed by the others, it was held that a demurrer should be overruled, and that the agreement could be enforced. Bailey *vs.* Wilson, 1 Devereaux & Battle, 182, was a case on an agreement to make a specified division of a father's estate, in order to prevent a contest over his will. In Price *et al. vs.* Winston *et al.*, 4 Munford, 63, it was ruled that an agreement to divide property, given by a will, between all the heirs-at-law, although certain ones did not take by the will, might be enforced, on the ground that those who did take, but whose interest was contingent, would, under the terms of the agreement, obtain a certain interest instead of the uncertain and contingent interest created in the will. These are some of the cases decided in this country. I have seen none (American) where the agreement was made after the death of the ancestor, in which the decision was not put on some special ground, such as those stated in these cases. As to agreements with reference to expectancies, I will notice them hereafter.

In Pullen *vs.* Ready, 2 Arkansas, 587, the agreement was about property bequeathed by will. Lord Hardwick sustained it on the ground that it had entirely settled all disputes between the parties and their several rights. Cory *vs.* Cory, 1 Vesey, Sr., 19; Neal *vs.* Neal, 1 Keen's Reports, 672; Stapleton *vs.* Stapleton, 1 Arkansas, 2; Stockley *vs.* Stockley, 2 Ves. and Beam., 23, are all cases arising on contracts of the nature of family arrangements. The decisions in them are put on the ground as stated by Sugden, Chancellor, cited in note on Stapleton *vs.* Stapleton, 2 Wharton & Tucker's Equity cases—"that whenever doubts and disputes have arisen with regard to the rights

of different members of the same family, and fair compromises have been entered into to preserve the harmony and affection, or save the honor of the family, those arrangements have been sustained by Courts of equity, albeit, perhaps, resting on grounds which would not have been satisfactory if the transaction had occurred between mere strangers." I might ask just here, does this contract, sought to be enforced by complainant's bill, come within this rule or within the principle of any of these decisions? Was any doubtful right compromised? Was any *family controversy* prevented or settled? Did it tend to preserve the harmony and affection or the honor of the family? Was it not rather a confederacy of the children to execute their own purposes despite their father; to defy him whilst living, and thwart his wishes after his death? In other words, it was intended to fortify the brother and only son, so he could, without fear, reject parental advice, and in the words of the bill, "brave his father's anger." But more of this hereafter. I have not been able to find but, one American and two English cases which grew out of agreements made by children, or by those who had reasons for expecting a share of the estate of a friend or relation, for the purpose of controlling the divisions of such *expectant* interests between themselves. The case of Lewis *vs.* Madison, 1 Munford, arose on a contract under seal between two brothers, by which one of them, for a *fair* and *valuable consideration*, agreed, that, when he should obtain possession of a tract of land expected to be devised to him by their father, he would convey it to the other. It was held that such a contract was not *contra bonos mores*, and would be enforced. Hobson *vs.* Trevor, 2 Pierre Williams, 191, is not one of the two English cases referred to above. The agreement there was by a father to convey, in consideration that the plaintiff married his daughter, one-third of what the obligor might receive of *his* father's estate, to the expected son-in-law. The marriage was consummated. Macclesfield, Lord Chancellor, said, "this is an agreement made upon a *valuable consideration*, that of the marriage of a *child*, and therefore fit to be executed in equity."

Mercier *vs.* Mercier.

Beckley *vs.* Newland, 2 *Ib.*, 182, and Wethered *vs.* Wethered, 2 Simon's Reports, 183, are the two cases in which it was directly held that an agreement stipulating that whatever the sons, in one case and the presumptive heirs in the other, might receive by will or by descent, should be equally divided between them, was good and not contrary to public policy. There was, in neither of these cases, any qualification such as was put in the decisions of those that have been cited. It was ruled, that " the agreement to share equally would not be disappointing the intent of a testator, for he did not design to put it out of either of the devisee's power to dispose of the estate after it should come to him ; but, on the contrary, when the testator gave it to either of them, he, by implication, gave that person a power to dispose of the said estate when it should come to him." In the latter of these two cases, the Vice Chancellor referred to that of Harwood *vs.* Tooke, which, he stated in his opinion, upheld the decision he then pronounced.

It is not necessary to dispute the authority of these decisions (which we do not,) to sustain the judgment we render. In neither of them was it the purpose of the contracting parties to defy the authority or advice of a parent, or one standing in *loco parentis.* They did not have for their object the accomplishment of a purpose directly contrary to the anxious desire of a living father, that would induce a son to place himself in hostility to that father, and which, under his well known and avowed wishes, instead of maintaining family harmony and affection, would create discord between parent and child, and probably sever the relations then existing between the father and both of these children, his only children. This contract between complainant and her brother had for its declared object the repudiation of a parent's advice and authority, so that both might be set aside during his life, with a guaranty of impunity to the son for any disobedience or want of filial loyalty on his part. How different was the spirit and intent of this contract from what Judge Story says is the reason why the agreements in the cases cited have been

sustained. In referring to these decisions, he says, "such agreements are generally made to suppress fraud and undue influence, and cannot be truly said to disappoint the testator's intention :" Story's Eq., sec. 265.

The law has a high regard for parental authority, and will give effect to nothing which tends to encourage disobedience to it. The same eminent jurist just cited, in speaking of contracts having that effect, after referring to post-obit bonds, and contracts affecting the marriage of children, adds : " When, indeed, the obligation to marry is reciprocal, although the marriage is to be deferred to a future period, there may not be, as between the parties, any objection to the contract in itself, if, in all other respects, it is entered into in good faith, and there is no reason to suspect fraud, imposition or undue influence. But even in these cases, if the contract is designed by the parties to impose upon third persons, as upon parents, or friends standing in *loco parentis*, or in some other particular relation to the parties, so as to disappoint their bounty, or to defeat their intention in the settlement or disposal of their estates—then, if the contract is clandestine, and kept secret for this purpose, it will be treated by Courts of equity as a fraud upon such parents or friends, and, as such, be set aside, or the equities will be held the same as if it had not been entered into. The general ground upon which this doctrine is sustained is, that parents and other friends standing in *loco parentis* are thereby induced to act differently in relation to the advancement of their children and relatives, from what they would if the facts were known ; and the best influence which might be exerted in persuading their children and relatives to withdraw from an unsuitable match is entirely taken away. To give effect to such contracts would be an encouragement to persons to lie upon the watch to procure unequal matches, against the consent of parents and friends, and to draw on improvident and clandestine marriages, *to the destruction of family confidence and the disobedience of parental authority. These are objects of so great importance to the best interests of society that they can scarcely be too deeply fixed in*

*the public policy of a nation, and especially of a Christian nation.*"

This long extract is given to show how jealous the law is of whatever tends to the destruction of family confidence, or to induce the disobedience of parental authority. It may be added that no Court has ever upheld an agreement which had that effect—which, on its face, discarded the authority of a living parent, and bargained for post-obit immunity for the one who repudiated that authority.

I have made no reference to a large class of cases, involving secret contracts with third persons, strangers to the family, as to the marriage of a son or daughter to such third person, with a penalty annexed in case of non-performance. In none of these cases, if the contract contravened the authority of the parent or the person in *loco parentis,* or was made in defiance of his. known wishes, was the agreement upheld. And the ground upon which their rejection is chiefly put is, that they operate as a fraud upon, and are subversive of the rights, interests and authority of parents.

There are other grounds taken in the demurrer upon which some of the members of this Court have doubts; but it is unnecessary to discuss them, as the judgment rendered finally disposes of the case. The demurrer ought to have been sustained.

Judgment reversed.