Geoghbgan, J.
(orally).
In February, 3916, Miss Annie L. Dexter, a member of an old Cincinnati family, died, leaving a will executed in July, 3914, which gave—
“To my faithful maid, $10,000, and in ease of the maid’s (who was a widow) death, the legacy was to go to her son.
“$5,000 to the Spring Grove Cemetery Association, ‘the income therefrom to be used for keeping in repair the Dexter mausoleum. ’
“$5,000 to the Cincinnati Musical Festival Association, ‘in memory of my uncle, Julius Dexter, a devoted friend and pioneer of said Association.’
“$5,000 to the Fresh Air Fund, to be known as the ‘Mary Dexter Memorial Fund,’ in memory of my dear sister, Mary Dexter.
“$3,000 to the Children’s Home.
“$2,000 to the Ohio Humane Society.
“To my nephew, Dexter Walker, my jewelry and all the family silver that is in my possession.
“To my nephew, Dexter Walker, the sum of $20,000, to be held for him in trust by my executor, the income therefrom to be paid to him quarterly, for the use and benefit of my nephew’s education, until he shall reach the age of twenty-one years, when said amount shall be paid over to him for his own property, provided he be willing to assume by law the name of Charles Dexter instead of Dexter Walker as he is now known. 'Should my said nephew refuse to take and bear the name of his grandfather Charles Dexter when he reaches the- age of twenty-óne years, then this said amount of $20,000 shall be paid to. the University of Cincinnati, to be known as the ‘Charles Dexter Memorial Fund,’ the income therefrom to be used in founding prizes or scholarships, .to encourage young-men in the study, of the-English language and literature.’-’ • - . -
*227 The residue of the estate was given and devised “to the Harvard University of Cambridge, Massachusetts,” said amount to be known as the “Charles Dexter Memorial Fund” in memory of my father, the income therefrom- to be used in encouraging young men to study profoundly the English language, and for the foundation of scholarships to be known as the “Charles Dexter Scholarships.”
The will was duly probated on April 5, 1916, and on April 8, 1916, Mrs. Alice Dexter Walker brought this suit to contest the will of her sister. Claudine Yenot, the maid and companion of the testatrix, who was with her when she died and had been with her for many years, and who, according to her testimony before me, thoroughly believed in the mental capacity of the testatrix, wras induced by the plaintiff in the latter part of April, 1916, to sign what on its face purports to be an answer in this case, setting forth that she joins in the prayer of the petition, in consideration of an agreement signed by the plaintiff, in which the plaintiff agreed to pay to said Claudine Yenot the amount of her legacy of $10,000, should the will be set aside and should the plaintiff receive the property of her sister’s estate. 'That legacy -of $10,000 is referred to in that agreement as compensation, but this is contradicted by the will, which provides that this legacy, in case of the death of Claudine Yenot, should go to her son. Claudine Yenot testified that her compensation as maid had been fully paid to her up to. a short time before the death of Miss Dexter, and that the balance thereafter coming due to her, had been paid to her by the executor. She also said that she had not understood the full purport of the answer, and it appeared that the meaning of the answer (her knowledge of English being limited) had not been explained to her.
Subsequently the plaintiff purchased the $2,000 legacy of the Ohio Humane Society and paid $1,000 for a written assignment, which authorized the executor to pay the legacy to her. The following May the plaintiff’s attorney wrote to the attorneys of .three other legateeSj offering a certain sum for the assignment *228 of those legacies, and stating that a settlement had been made with other legatees, and that the intention was to cause the legatees to retire from the case.
On the argument, both oral and in their briefs, plaintiff’s counsel admitted that the plaintiff had intended to compromise her action and to set aside the will through an adjustment with each beneficiary, and that in two instances' there was an adjustment, one where a legacy was purchased, and one where a legatee was indemnified; that there was failure with the others because of the inability to come to terms.
On these facts the motions for the dismissal of the action, which were madé by all of the legatees except those with whom the adjustment had been made, were presented to the court.
I have come to the conclusion, after a careful reading of al] the authorities, that these motions should be granted, for two reasons : The first is that it is contrary to the public policy of Ohio, as I view it, for agreements to be .made and entered into which have a tendency to withdraw litigants, who are legatees under a will, from a suit and thus make it possible for other legatees to be defeated in their rights. Whatever may be the public policy of other states, 'it is certainly the public policy of Ohio that wills should be sustained; that no agreements should be entered into which have for their object the setting aside of a will of a decedent.
In the ease of Wagner v. Zeigler, 44 O. S., 59, the court at page 66 uses the following language:
“The language of the opinion in Walker v. Walker, 14 O. S., 157, is cited. Speaking of trial, by jury, Brinkerhoff, J., on page 176, says that ‘This provision of the statute is imperative in its terms, and we have reason to believe that it was deliberately enacted with a view to prevent a disposition of eases for the contest of wills upon the mere consent or acquiescence of parties in any form.’ This language, and the statute as well, may properly be read in the light of our knowledge of the mischief sought to be remedied, which was, speaking from tradition and history, a tendency to procure the setting aside of wills by consent decrees in.chancery. The' first statute upon the subject provided that, when the widow or person of kin appeared *229 to contest the will, the court should take cognizance thereof and grant proceedings thereon according to law. This furnished an easy mode of disregardihg the expressed wish and purpose of the dead testator, and necessitated a change, incorporating, as a requirement, trial by jury, as in the present statute. This statute, taken as a whole, negatives any idea that the Legislature intended to encourage the setting aside of wills; quite a contrary purpose is manifest.”
I have also examined a great manjr authorities in other states with reference to this kind of contracts, and I have found that in some states there are authorities which hold that family arrangements made with the consent of all, with emphasis on the word all, of the persons interested in the will or heirs-at-law, may be sustained after the will is properly admitted to probate, upon the theory that all the beneficiaries may, after their interests have been determined for them, make any disposition of the property left or devised as they think proper. But I am strongly impressed by the language of the Supreme Court of Missouri in the case of Ridenbaugh v. Young, 145 Missouri, 274, in passing upon a contract entered into between a brother and a sister, whereby the brother agreed, after he had instituted proceedings in the Circuit Court of Buchanan County, in the state of Missouri, to set aside a certain will and testament of his father, to pay his sister, who was one of the beneficiaries and legatees under the will the sum of ten thousand dollars out of his share, and all the costs of the proceedings and attorney fees in case he succeeded in setting aside and annulling said will. The court in that case, discussing the question of public policy said:
“The all important question then is as to whether or not the contract is against public policy. Agreements relating to proceedings in civil courts involving anything inconsistent with the full and impartial course of justice therein, though not open to the charge of actual corruption, are void.” 3 Am. & Eng. Ency. of Law, 879, 881. It is said that all agreements for pecuniary consideration to control the regular administration of justice are void as against public policy, without reference to the question whether improper means are contemplated or used *230 in their execution.” Tool Company v. Norris, 2 Wall., loc. cit. 56. Greenwood on Pub. Policy, page 5, lays down the rule as follows:
"The question of the validity of the contract does not depend upon the circumstances whether it can be shown that the public has in fact suffered any detriment, but whether the contract is, in its nature, such as might have been injurious to the public. It matters not that any particular contract is free from taint, or actual fraud, oppression or corruption. The law looks to the general tendency of such contracts.’ In speaking of contracts of this character in Woodstock Iron Company v. Extension Co., 129 U. S., 663, Mr. Justice Field said: ‘‘They are against public policy because of their corrupt tendency, whether lawful or unlawful means are contemplated or used in carrying them into execution.’ 2 Wall. loe. eit., 56, it is said: The law looks to the general tendency of such agreements; and it closes the door to temptation, by refusing them recognition in any of the courts of the country.”
The rule is also stated in a note appended to the case of Cochran v. Zachary, 16 L. R. A. (N.S.), at page 237, as follows:
“But where the contract is not made by all the parties in interest, and the purpose and effect of it are to prevent or defeat the probate of a will, thereby to defeat the rights of certain legatees or devisees therein, not parties thereto, the courts passing upon the question are equally unanimous in holding it violative of public policy and void.”
Such was the conclusion of the court in Gray v. McReynolds, 65 Iowa, 461; in Wilson v. Jordan, 3 Woods, 642, and Mercier v. Mercier, 50 Ga., 546, as well as in Ridenbaugh v. Young, which I have just cited.
I realize that the aforesaid cases were all in contract, and either in enforcement of contract or in repudiation or recession of contract. But I believe when circumstances such as are shown to exist here are brought to the attention of the court, it is the duty of the court to declare as a matter of public policy that an action like this should not proceed; and I am somewhat strengthened in that position by the views of Jtidge Wanamaker, of our own' Supreme Court, expressed in the case of Pittsburg, *231 Cincinnati, Chicago & St. Louis Railway Company v. Kinney, 95 Ohio State (November 28, 1916), as follows:
“Sometimes such public policy is declared by constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people — in their clear consciousness and conviction of what is naturally and inherently just and right between man and man. It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic.”
And the court proceeds to rigorously uphold the right of any court where a course of conduct is presented that is shocking to the average man’s sense of justice to hold that such course of conduct is contrary to public policy, though such policy has never been written in constitution, statute or decree of court. And this court earnestly concurs in that view, and applies it to the facts in hand. We have here, after an action has been brought, a confessed attempt to withdraw all the legatees, at least those legatees who may be included under the general term of charities, from the defense of this suit.
The plaintiff confessedly made an attempt to buy up all the legacies mentioned for the purpose of having this will set aside, or, as her counsel expressed it in his argument, to expunge this will from the record. Failing in her attempt to buy up all the legacies, the plaintiff entered into an agreement whereby she agreed to pay one of the beneficiaries, who would necessarily be an important witness, the amount of her legacy even though she were successful in breaking the will. Such an arrangement, whether made through corrupt motives or not, has an exceedingly vicious tendency, and is not in consonance with those principles which make for the true and exact administration of justice in the courts.
There is another reason why these motions should be granted, and that is based on a simple rule of equity. Plaintiff is on both sides of this suit; she is claiming under this will and against it. The rule depends on no principle of estoppel or of election, *232 but is simply a rule of equity that a person can not claim under a will and against it. That doctrine was enunciated early in England and was enunciated in this country in the time of Chief Justice Marshall. (See Herbert v. Wren, 7 Cranch, 370.)
I have read every case that counsel cited to me on the subject, and other cases found by independent search, and I do not find another case where the court repudiates that doctrine unless it be the case of Kelley v. Hazzard, 96 O. S. I can say to'you now I have, to my own satisfaction, arrived at the conclusion the Supreme Court of Ohio did not intend by its decision in that case to repudiate that well established doctrine of law. In the first place, the court does not in its opinion refer to any of the well known cases on the subject. The facts of that case were simply these: An executor who evidently would have benefitted by the sustaining of the will induced a legatee to accept her legacy upon his false and fraudulent representation as to the conditions of her aunt’s mind and the value of her aunt’s estate. She discovered this fraud and offered to tender back the legacy and brought suit to .set aside the will. The executor pleaded that she had accepted the legacy under the will and therefore she was not entitled to maintain the action. And she set up then as a matter of answer to his defense the fraud that had been practiced upon her, and the court in the case held that under such circumstances a plea of estoppel against her would not be available. I am frank to say that I do not think the question wé have in this case was squarely presented to the court in that case. The court does not refer to a single case wherein the rule of equity I have just referred to is considered.
I can not bring myself to think that our Supreme Court intended to say that, where no fraud is present and the legatee has full knowledge of all the facts, that she might purchase, hold and claim an interest under a will and at the same time contest its validity. If this be so, then Ohio stands at variance with the authorities upon this proposition, a position I am unwilling to believe the court intended to assume.
The decision in Kelley v. Hazzard should not be extended beyond the limitations imposed by the particular facts of that case, *233 and those facts are almost entirely dissimilar from the facts in the case at bar.
Therefore, having accepted the assignment of the legacy of the Ohio Humane Society, and having filed it with the executor, the plaintiff is now in a position to gain, no matter whether the will be sustained or set aside.
This position can not be sustained under the law and the motion will be granted.
Note. — The official reports having not as yet been published, the eases of Railway Co. v. Kinney and Kelley v. Hazzard, hereinbefore cited, may be found in the issues of The Ohio Law Reporter of April 16, 1917, and October 8, 1917, respectively.